IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROBERT HARRISON, *et. al* | ) | |
| | ) | Case No. 1:20-cv-828 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTERNAL REVENUE SERVICE, *et. al* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

**(Oral Argument Requested)**

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT .............................................................................................. 1

II.   BACKGROUND ............................................................................................................. 4

   a.   Statutory and Regulatory Background ........................................................................ 4

      i.   Taxpayers' Obligation to Report Foreign Bank Accounts ......................................... 4

      ii.  General background related to the IRS's Offshore Voluntary Disclosure Programs ................... 5

   b.   Plaintiffs' admitted violation of the Bank Secrecy Act and entry into OVDP ............................... 6

   c.   Streamlined Domestic Procedures and Transitional Treatment .................................................. 8

   d.   IRS's denial of Transitional Treatment; Plaintiffs' allegations of duress ...................................... 10

   e.   Plaintiffs' execution of their Closing Agreement .......................................................... 11

III.  STANDARD OF REVIEW ................................................................................................ 12

IV.   ARGUMENT ................................................................................................................ 13

   a.   This suit is a challenge to the IRS's assessment and collection of Title 26 taxes and penalties ..... 13

   b.   Plaintiffs waived their right to litigate the tax and penalty assessments set forth in their Closing
Agreement ................................................................................................................... 15

      i.   Background concerning Closing Agreements ............................................................... 15

      ii.  The Closing Agreement unambiguously waived Plaintiffs' right to challenge the tax and penalty
assessments described therein ...................................................................................... 16

      iii. Even taken as true, Plaintiffs' factual allegations do not state a prima facie claim for duress ... 17

   c.   Plaintiffs fail to state a claim for relief under the Administrative Procedure Act .......................... 20

      i.   Plaintiffs cannot state a claim under the APA because (but for their Closing Agreement) a
refund action would provide an adequate remedy in court ................................................. 20

      ii.  Plaintiffs cannot state a claim under the APA because the Transition Rules do not constitute
"final agency action" ................................................................................................... 22

      iii. Plaintiffs cannot state a claim under the APA because the Transition Rules constitute a
presumptively unreviewable exercise of enforcement discretion (rather than rulemaking) .............. 23

   d.   Plaintiffs do not state a claim for relief under the Fifth Amendment ............................................. 28

V.    CONCLUSION ............................................................................................................. 32

## Table of authorities

Cases

*Am. Farm Lines v. Black Ball Freight Serv.*,
  397 U.S. 532 (1970) ................................................................................ 30
*Am. Sec. Vanlines, Inc. v. Gallagher*,
  782 F.2d 1056 (D.C. Cir.1986) ............................................................. 17, 18
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................. 12, 17
*Ass'n of Irritated Residents v. E.P.A.*,
  494 F.3d 1027 (D.C. Cir. 2007) ............................................................. passim
*Bagenstose v. D.C.*,
  503 F. Supp. 2d 247 (D.D.C. 2007) ........................................................... 31
*Bagenstose v. D.C.*,
  2008 WL 2396183 (D.C. Cir. May 27, 2008) ............................................... 31
*Baltimore Gas & Elec. Co. v. F.E.R.C.*,
  252 F.3d 456 (D.C. Cir. 2001) ................................................................. 28
*Bd. of Regents of State Colls. v. Roth*,
  408 U.S. 564 (1972) .............................................................................. 30
*Bedrosian v. United States*,
  912 F.3d 144 (3d. Cir. 2018) ..................................................................... 5
*Bennett v. Spear*,
  520 U.S. 154 (1997) .............................................................................. 22
*Bob Jones Univ. v. Simon*,
  416 U.S. 725 (1974) .............................................................................. 31
*Brees v. Hampton*,
  877 F.2d 111 (D.C. Cir. 1989) ................................................................. 19
*Bunce v. United States*,
  28 Fed. Cl. 500 (Fed. Cl. 1993) ............................................................... 29
*Bunce v. United States*,
  26 F.3d 138 (Fed. Cir. 1994) ................................................................... 29
*Clark v. Comm'r*,
  96 T.C.M. (CCH) 448 ............................................................................ 16
*Cohen v. United States*,
  650 F.3d 717 (D.C. Cir. 2011) ................................................................. 15
*Connecticut Dep't of Children & Youth Servs. v. Dep't of Health & Human Servs.*,
  9 F.3d 981 (D.C. Cir. 1993) ..................................................................... 24
*Cortec Industries, Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) ...................................................................... 13
*Davis v. United States*,
  811 F.3d 335 (9th Cir. 2016) ................................................................... 16
*Dewees v. United States*,
  272 F. Supp. 3d 96 (D.D.C. 2017) ...................................................... 4, 5, 31
*Dewees v. United States*,

767 F. App'x 4 (D.C. Cir. 2019)............................................................. 4, 5, 29, 31

*Doe v. United States*,
    372 F.3d 1308 (Fed. Cir. 2004)............................................................. 20

*DRG Funding Corp. v. Sec'y of Housing and Urban Dev.*,
    76 F.3d 1212 (D.C.Cir.1996)............................................................. 23

*Ellinger v. United States*,
    450 F.3d 1325 (11th Cir. 2006) ............................................................. 16

*Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*,
    799 F.3d 1065 (D.C. Cir. 2015)............................................................. 21

*Gustave–Schmidt v. Chao*,
    226 F.Supp.2d 191 (D.D.C. 2002) ............................................................. 12

*Heckler v. Chaney*,
    470 U.S. 821 (1985)............................................................. 23, 24, 25, 26

*Hinton v. Corr. Corp. of Am.*,
    624 F. Supp. 2d ............................................................. passim

*Hurd v. D.C., Gov't*,
    864 F.3d 671 (D.C. Cir. 2017) ............................................................. 12

*He Depu v. Yahoo! Inc.*,
    950 F.3d 897 (D.C. Cir. 2020)............................................................. 12

*Johnson v. Penn Camera Exch.*,
    583 F. Supp. 2d 81 (D.D.C. 2008) ............................................................. 16

*King v. Donnkenny, Inc.*,
    84 F. Supp. 2d 736 (W.D. Va. 2000) ............................................................. 18

*Ky. Dep't of Corr. v. Thompson*,
    490 U.S. 454 (1989)............................................................. 29

*Larson v. United States*,
    888 F.3d 578 (2d Cir. 2018)............................................................. 21

*Marathon Oil Co. v. United States*,
    42 Fed. Cl. 267 (1998) ............................................................. 16
    215 F.3d 1343 (Fed. Cir. 1999)............................................................. 16

*Marciano v. Shulman*,
    795 F. Supp. 2d 35 (D.D.C. 2011) ............................................................. 29

*Maze v. Internal Revenue Serv.*,
    206 F. Supp. 3d 1 (D.D.C. 2016) ............................................................. 5, 6, 14

*Maze v. Internal Revenue Serv.*,
    862 F.3d 1087 (D.C. Cir. 2017)............................................................. 4, 13, 15, 21

*National Ass'n of Home Builders v. Norton*,
    415 F.3d 8 (D.C. Cir. 2005)............................................................. 23

*NB ex rel. Peacock v. District of Columbia*,
    794 F.3d 31 (D.C. Cir. 2015)............................................................. 29

*Parker v. N. Carolina Agr. Fin. Auth.*,
    341 B.R. 547 (E.D. Va. 2006)............................................................. 18

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993)............................................................. 12

*Perry Capital LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ............................................................. 20

*Phillips v. Comm'r of Internal Revenue*,
   283 U.S. 589 (1931) .................................................................................... 31
*Raoof v. Sullivan*,
   315 F. Supp. 3d 34 (D.D.C. 2018) ............................................................. 30
*Raven v. Sajet*,
   334 F. Supp. 3d 22 (D.D.C. 2018) ............................................................. 30
*Roberts v. United States*,
   741 F.3d 152 (D.C. Cir. 2014) .................................................................... 30
*Royer v. Fed. Bureau of Prisons*,
   933 F. Supp. 2d 170 (D.D.C. 2013) ........................................................... 26
*Ryskamp v. Comm'r*,
   797 F.3d 1142 (D.C. Cir. 2015) .................................................................. 15
*Satterlee v. Comm'r of Internal Revenue*,
   195 F. Supp. 3d 327 (D.D.C. 2016) ........................................................... 15
*Schmidt v. Shah*,
   696 F.Supp.2d 44 (D.D.C. 2010) ............................................................... 17
*Sierra Club v. U.S. Fish & Wildlife Serv.*,
   930 F. Supp. 2d 198 (D.D.C. 2013) ........................................................... 24
*Sierra Club v. Jackson*,
   648 F.3d 848 (D.C. Cir. 2011) .............................................................. 24, 28
*Starr Int'l Co. v. United States*,
   910 F.3d 527 (D.C. Cir. 2018) .............................................................. 15, 20
*Strumsky v. Washington Post Co.*,
   842 F. Supp. 2d 215 (D.D.C. 2012) ........................................................... 12
*Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*,
   480 F.3d 1116 (Fed. Cir. 2007) .................................................................. 20
*Tingzi Wang v. U.S.C.I.S.*,
   375 F. Supp. 3d 22 (D.D.C. 2019) ............................................................. 30
*Town of Castle Rock, Colo. v. Gonzales*,
   545 U.S. 748 (2005) .................................................................................... 30
*United States v. Bohanec*,
   263 F. Supp. 3d 881 (C.D. Cal. 2016) ......................................................... 5
*United States v. Clintwood Elkhorn Min. Co.*,
   553 U.S. 1 (2008) ...................................................................... 3, 13, 15, 21
*United States v. ConocoPhillips Co.*,
   744 F.3d 1199 (10th Cir. 2014) ................................................................. 16
*United States v. Michel*,
   282 U.S. 656, (1931) .................................................................................. 15
*Weaver v. Bratt*,
   421 F. Supp. 2d 25 (D.D.C. 2006) ............................................................. 18
*Webster v. Doe*,
   486 U.S. 592 (1988) .............................................................................. 24, 26
*Wolverine Petroleum Corp. v. Comm'r of Internal Revenue*,
   75 F.2d 593 (8th Cir. 1935) ....................................................................... 16
*Wright v. Eastman Kodak Co.*,
   445 F. Supp. 2d 314 (W.D.N.Y. 2006) ...................................................... 18

*Wright v. Foreign Serv. Grievance Bd.*,
   503 F. Supp. 2d 163 (D.D.C. 2007) .................................................................... 18, 19

## Statutes

5 U.S.C. § 701 ........................................................................................................ 3, 24
5 U.S.C. § 704 .......................................................................................... 3, 14, 20, 22
26 U.S.C. § 5321(a)(5)(B) ............................................................................................ 31
26 U.S.C. § 6224(c) ..................................................................................................... 29
26 U.S.C. § 6532(a)(1) ................................................................................................. 15
26 U.S.C. § 7121(a) ............................................................................................... 15, 25
26 U.S.C. § 7121(b) ................................................................................................. 7, 16
26 U.S.C. § 7122 .......................................................................................................... 25
26 U.S.C. § 7401 .......................................................................................................... 25
26 U.S.C. § 7403 .......................................................................................................... 25
26 U.S.C. § 7421 .......................................................................................................... 14
26 U.S.C. § 7422 ................................................................................................... passim
26 U.S.C. § 7422(a) ..................................................................................................... 21
28 U.S.C. § 1346(a)(1) ................................................................................. 3, 15, 20, 21
28 U.S.C. § 1491(a)(1) ................................................................................................. 20
31 U.S.C. § 5311 ............................................................................................................ 4
31 U.S.C. § 5314 ............................................................................................................ 4
31 U.S.C. § 5321(a)(5)(B) .......................................................................................... 2, 8
31 U.S.C. § 5321(a)(5)(C) .......................................................................................... 1, 8
31 U.S.C. § 5322 ........................................................................................................ 1, 5
U.S.C. § 7422 ............................................................................................................... 20
U.S.C § 7422 ................................................................................................................ 21

## Regulations

26 C.F.R. § 1.7121-1(a) ............................................................................................... 25
26 C.F.R. § 301.7122-1 ................................................................................................ 26
26 C.F.R. § 301.7122-1(c) ........................................................................................... 25
26 C.F.R. § 301.7122-1(d) ........................................................................................... 26
26 C.F.R. §§ 301.7121-1(d) ......................................................................................... 28
31 C.F.R. § 1010.306(c) ................................................................................................. 4
31 C.F.R. § 1010.350 ..................................................................................................... 4

## I.     PRELIMINARY STATEMENT

Robert Harrison and Julianne Sprinkle repeatedly broke the law by failing to disclose that they had stashed roughly one million dollars in a Swiss bank account. In 2018, they chose to settle the resulting potential liability with the IRS. This suit is an attempt to undo that decision.

By their own admission, Plaintiffs deposited hundreds of thousands of dollars into a Swiss bank account with UBS in 2002. After failing to disclose that account (as required) for more than a decade, they faced the possibility of criminal prosecution 31 U.S.C. § 5322 and a substantial civil penalty.  To wit: in 2004, Congress increased the maximum civil penalty for *each* willful failure to file a Foreign Bank Account Report ("FBARs") to the *greater* of $100,000 per undisclosed account or 50% of the value of the undisclosed accounts. 31 U.S.C. § 5321(a)(5)(C).  Given that Plaintiffs had more than $1.2 million in their Swiss account in 2007, they could have been assessed a willful FBAR penalty in excess of $600,000 *for that year alone.* They also faced federal income tax and penalty liabilities related to any unreported income.

Plaintiffs, both of whom are lawyers, decided not to roll the dice. In April 2014, and with the aid of counsel, they entered one of the IRS's settlement initiatives: the Offshore Voluntary Disclosure Program ("OVDP"). Under OVDP, Plaintiffs filed their delinquent FBARs, amended their prior tax returns, received some assurances against criminal prosecution, and executed a "Closing Agreement." The Closing Agreement limited the IRS to assessing only agreed-upon taxes, interest, accuracy-related penalties, and a *single* $344,545 "Miscellaneous Offshore Penalty" ("MOP") (*i.e.*, 27.5% of the highest aggregate value of their Swiss account). In exchange, Plaintiffs paid these assessments and expressly waived their right to challenge the liabilities or seek a refund of the payment in the future.

In June 2014–after Plaintiffs had made their OVDP disclosures but before they executed their Closing Agreement–the IRS announced the creation of more lenient "Streamlined Domestic

Offshore Procedures" ("Streamlined Domestic Procedures"), which would operate in parallel with OVDP.  Under the Streamlined Domestic Procedures, taxpayers *who were not already participating in OVDP* could self-certify that their disclosure violations had been non-willful and pay a reduced 5% MOP.  The "catch," however, was that the Streamlined Domestic Procedures did not result in a binding Closing Agreement. Thus, unlike with OVDP, the IRS retained the right to examine (*i.e.*, audit) the taxpayer and make additional assessments in the future.

The IRS allowed existing OVDP participants (like Plaintiffs) who were ineligible for the Streamlined Domestic Procedures because they were already participating in the OVDP to instead request a "transition" to the more lenient 5% penalty structure. If granted, the 5% penalty would be incorporated into their final Closing Agreement. Yet so-called "Transitional Treatment" was not automatic: the IRS announced that it would not grant a transition request where the available information was not consistent with the taxpayer's certification that their conduct had been non-willful.

If the IRS denied a request, an OVDP participant could still choose between executing a Closing Agreement (and paying OVDP's 27.5% MOP), or "opting out" of OVDP and having their case resolved through examination.  Opting out made sense for taxpayers confident their conduct was non-willful: the penalty for non-willful FBAR violations ($10,000 per violation) was a fraction of the statutory maximum for willful violations and *far* less than OVDP's 27.5% MOP. Plus, non-willful taxpayers who could establish "reasonable cause" were not subject to any FBAR penalties at all. *See* 31 U.S.C. § 5321(a)(5)(B). And, even if the IRS assessed willful FBAR penalties at the conclusion of the exam, the taxpayer could challenge the penalties in court.

Although Plaintiffs requested Transitional Treatment, the IRS denied the request. For reasons known only to Plaintiffs and their prior attorney, Plaintiffs declined to opt-out of OVDP to

allow their case to be resolved through an administrative examination.  Instead, on April 6, 2018, Plaintiffs submitted their signed Closing Agreement (along with payment of the 27.5% MOP).

Now, two years later, Plaintiffs seek to repudiate their Closing Agreement and raise a facial challenge to the IRS's "Transition Rules" (*i.e.*, the IRS's FAQ document that discusses the procedures the IRS intended to use to process Transitional Treatment requests).  Counts I and II assert that the Transition Rules are (I) procedurally and (II) substantively invalid under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Count III asserts that the Transition Rules violate the Fifth Amendment's guarantee of procedural due process.  Count IV alleges that Plaintiffs' Closing Agreement is voidable for "duress."  Plaintiffs request an order (1) voiding their Closing Agreement; (2) requiring the IRS to return all of the money that Plaintiffs paid under OVDP; (3) "invalidating" the IRS's "Transition Rules," and (4) compelling the IRS to allow Plaintiffs to "transition" to the 5% penalty.

<div align="center">*     *     *</div>

Put simply, there is no cause of action for buyer's remorse.  Though framed as an APA suit, this case is really about recovering the tax and penalty assessments to which Plaintiffs consented (and paid) when they signed their Closing Agreement. Though Count IV asserts that Plaintiffs signed the Closing Agreement under duress, Plaintiffs fail to plead a prima facie duress claim. Nowhere do Plaintiffs allege (plausibly or otherwise) that the IRS made an improper threat, or that an IRS examination (subject to judicial review) was not a reasonable alternative to the Closing Agreement.  Accordingly, the Court should dismiss Count IV, and further hold that Plaintiffs waived their right to challenge the IRS's assessments or collections at issue here.

Waiver aside, the Court lacks jurisdiction over Plaintiffs' APA claims because, as noted, this is fundamentally a refund suit that can only be brought under 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.  *See United States v. Clintwood Elkhorn Min. Co.*, 553 U.S. 1, 12 (2008).  The refund suit remedy also precludes stating a claim under the APA. 5 U.S.C. § 704 (no action available under APA unless

<div align="center">3</div>

there is "no other adequate remedy in a court"); *cf. Maze v. Internal Revenue Serv.*, 862 F.3d 1087, 1093 (D.C. Cir. 2017) (refund is adequate alternative remedy). Moreover, the IRS's "Transition Rules" do not constitute final agency action (or rulemaking) subject to APA review.

The Amended Complaint also fails to state a claim for a constitutional injury because no one has a vested right in settling their FBAR violations through Transitional Treatment (rather than through an administrative exam subject to judicial review). Plaintiffs therefore fail to identify any "liberty or property interest" that is a prerequisite for their Fifth Amendment claim.

For all these reasons, the Court should dismiss the Amended Complaint.

## II.     BACKGROUND

### a.  Statutory and Regulatory Background

#### i.  Taxpayers' Obligation to Report Foreign Bank Accounts

Congress passed the Bank Secrecy Act of 1970 to require certain reports and records that may be useful in "criminal, tax, or regulatory investigations or proceedings, or in the conduct of intelligence or counterintelligence activities . . . . " 31 U.S.C. § 5311. One provision of the Act, 31 U.S.C. § 5314, instructs the Secretary of the Treasury to prescribe rules that require persons to file an annual report identifying certain transactions or relations with foreign financial agencies. The Secretary has implemented this statute through various regulations, including 31 C.F.R. § 1010.350, which specifies that certain United States persons must annually file a report of their foreign account known as an FBAR. Covered persons must file it each year for foreign accounts exceeding $10,000 in the prior calendar year. 31 C.F.R. § 1010.306(c).  The authority to enforce the FBAR requirement has been delegated to the Commissioner of Internal Revenue. *Id.* § 1010.810(g); *see also* Internal Revenue Manual § 4.26.1, Ex. 4.26.1-3 (U.S. Dep't of Treasury Memorandum of Agreement and Delegation of Authority for Enforcement of FBAR Requirements). *See generally Dewees v. United States*, 272 F. Supp. 3d 96, 98 (D.D.C. 2017) (Cooper, J.), aff'd, 767 F. App'x 4 (D.C. Cir. 2019).

A taxpayer who willfully fails to file an FBAR can be subject to up to five years in prison. 31 U.S.C. § 5322. Since 2004, the maximum civil penalty for a willful violation has been the greater of $100,000 or 50% of the balance in the unreported foreign account at the time of the violation. *Id.* § 5321(a)(5)(C)(i). And in the civil FBAR context, "willful" conduct includes more than just intentional or "knowing" violations. Willfulness includes recklessness and "willful blindness" to one's reporting obligations. *E.g. Bedrosian v. United States*, 912 F.3d 144, 152–53 (3d. Cir. 2018); *United States v. Bohanec*, 263 F. Supp. 3d 881, 889–90 (C.D. Cal. 2016).

### ii. General background related to the IRS's Offshore Voluntary Disclosure Programs

Because it lacks the resources necessary to investigate every potential instance of tax evasion, the IRS utilizes voluntary disclosure as a tool to encourage non-compliant taxpayers to come into compliance.[1] *See generally Maze v. Internal Revenue Serv.*, 206 F. Supp. 3d 1, 5-6 (D.D.C. 2016); *Dewees v. United States*, 272 F. Supp. 3d at 99. For roughly 20 years, the IRS has implemented this practice, in part, via several well-publicized initiatives offering taxpayers who have assets hidden offshore an opportunity to resolve their civil liabilities for tax and penalties on predictable terms and avoid criminal prosecution. *See e.g., id*; Am. Compl. ¶¶ 3-4, 6-8.

Over time, the IRS modified these programs to encourage different categories of taxpayers (with different degrees of potential criminal or civil liability) to come forward. *Id.*, *see also* IRS OFFSHORE PROGRAMS PRODUCE $4.4 BILLION TO DATE FOR NATION'S TAXPAYERS; OFFSHORE VOLUNTARY DISCLOSURE PROGRAM REOPENS, IR-2012-5, Jan. 9, 2012,

---

[1] For example, the IRS Criminal Investigations Division's voluntary disclosure practice is set forth in the Internal Revenue Manual at I.R.M. 9.5.11.9. In pertinent part, the Internal Revenue Manual states that a "voluntary disclosure will not automatically guarantee immunity from prosecution; however, a voluntary disclosure may result in prosecution not being recommended." I.R.M. 9.5.11.9 (Dec. 2, 2009). The Internal Revenue Manual further explains that it is "the practice of the I.R.S. that a voluntary disclosure will be considered . . . in determining whether criminal prosecution will be recommended." *Id.*

https://www.irs.gov/pub/irs-news/ir-12-005.pdf (updated Oct. 28, 2013) ("the IRS may increase

penalties in the program for all or some taxpayers or defined classes of taxpayers . . . or . . . end the

program entirely at any point") *visited* July 14, 2020.

A significant aspect of the various offshore settlement initiatives was that the IRS would

limit the number of tax years considered and to compromise all the penalties for which taxpayers

would otherwise be liable in a one-time payment, referred to as a "miscellaneous offshore penalty"

("MOP"). *Maze*, 206 F. Supp. 3d 1 at 6. The so-called MOP was typically measured as a percentage

of the highest aggregate balance of the taxpayers' foreign accounts and value of their foreign assets

("foreign financial assets' aggregate value"). The MOP percentage at the time Plaintiffs entered

OVDP was 27.5%. *See* Am. Compl. ¶ 6.

The IRS reported in 2015 that various iterations of the OVDPs brought more than 54,000

taxpayers into compliance and collected over $8 billion in delinquent taxes, penalties, and interest –

all without devoting the substantial resources that would have been necessary to conduct thousands

of examinations on a taxpayer-by-taxpayer basis. *See* OFFSHORE COMPLIANCE PROGRAMS

GENERATE $8 BILLION; IRS URGES PEOPLE TO TAKE ADVANTAGE OF VOLUNTARY DISCLOSURE

PROGRAMS, (IR-2015-116, Oct. 16, 2015), https://perma.cc/AH22-QBRR *visited* July 17, 2020.

**b. Plaintiffs' admitted violation of the Bank Secrecy Act and entry into OVDP**

In the early 2000s, Plaintiffs deposited roughly $850,000 with the Swiss bank, UBS AG. *See*

Am. Compl. ¶¶ 58-62. By the end of 2007, this amount had grown to $1,252,890. *See* Am. Compl.

¶ 74; Gov't Ex. A[2] at ¶ 7 (copy of Plaintiffs' fully executed Closing Agreement, which is referred to

---

[2] Exhibit A, which is a copy of Plaintiffs' Closing Agreement signed by Plaintiffs and the IRS, is
referred to in the complaint and is central to the plaintiffs' claim (it is the agreement plaintiffs seek
to set aside). *See* Am. Compl ¶¶ 71-73, 95. Accordingly, the Court can consider the exhibit without
converting the motion to one for summary judgment. *E.g. Hinton v. Corr. Corp. of Am.*, 624 F. Supp.
2d at 46. Although the balance in Plaintiffs' account is immaterial at this phase of the litigation, the

in the complaint); Gov't. Ex. B[3] at *2 (Copy of Plaintiff's October 24, 2015 Certification of Non-Willfulness, which as part of Plaintiffs' request for transitional treatment is referred to in the complaint) (listing year-end balance). Plaintiffs did not take any action to rectify their FBAR violations until April 2014, when they allege to have entered OVDP. *See* Am. Compl. ¶¶ 62-63. Compl. ¶ 63.[4]

Under OVDP, Plaintiffs disclosed their foreign assets, filed amended returns, paid additional taxes and, at the conclusion of the process, Plaintiffs and the IRS entered into a "final and conclusive" Closing Agreement. *See Am. Compl.* ¶¶ *73, 74;* Gov't. Ex. A at *12. By its terms (and 26 U.S.C. § 7121(b)), the Closing Agreement could only "be reopened in the event of fraud, malfeasance, or misrepresentation of material fact." Gov't. Ex. A. It provided:

> By signing this closing agreement, _Taxpayers consent to the assessment and_
> _collection_ of the liabilities for tax, interest, additions to tax, and
> penalties determined by or resulting from the determinations of this

---

$1,252,890 balance is supported by the MOP recited in the Closing Agreement (*i.e.*, 27.5% of $1,252,890 = $344,545).

[3] Exhibit B is a copy of Plaintiffs' certification of non-willfulness, which is referred to in the complaint insofar as it was part of their request for Transitional Treatment. Am. Compl ¶¶ 2, 65-67. It is also essential to Plaintiffs' standing to raise a facial challenge against the "Transition Rules," because absent such a certification, they would have been ineligible to apply for (or receive) Transitional Treatment. Accordingly, the Court can consider the exhibit without converting the motion to one for summary judgment. *E.g. Hinton*, 624 F. Supp. 2d at 46.

If the Court concludes that Exhibit B is "outside the pleadings," the Court should ignore it and nevertheless conclude that (1) Plaintiffs voluntarily waived their right to challenge the assessments made through OVDP; and (2) a tax refund action brought in compliance with I.R.C. § 7422–rather than an APA suit or free-standing constitutional challenge– is the exclusive means for Plaintiffs to recover their tax penalties and challenge the Transition Rules.

[4] The government assumes the truth of plaintiffs' allegations, but notes that there is some incongruity within the Amended Complaint's allegations concerning which iteration of OVDP (2012 or 2014) Plaintiffs entered. *Compare* Am. Compl. ¶ 63 (alleging that Plaintiffs entered into the "2014 OVDP" *in April 2014*); *with* Am. Compl. ¶ 10 (alleging IRS announced Transition Rules for existing OVDP participants June 18, 2014). Ultimately, this inconsistency is immaterial to the government's arguments that (1) Plaintiffs voluntarily waived their right to challenge the assessments made through OVDP; (2) a tax refund action brought in compliance with I.R.C. § 7422–rather than an APA suit or free-standing constitutional challenge– is the exclusive means for Plaintiffs to recover their tax penalties and challenge the Transition Rules.

> agreement, *waiving all defenses* against and restrictions on the
> assessment and collection of those liabilities, including any defense
> based on the expiration of the period of limitations on assessment or
> collection. *Taxpayers agree not to file a refund claim* for the underlying tax,
> penalties, and interest for any amount that relates to the
> underreported income described in this closing agreement, for any
> years subject to this closing agreement, *on any grounds*.

*Id.* at ¶ 9 (emphasis added).

In exchange for Plaintiffs waiving their right to challenge the IRS's assessments and

collection, the IRS agreed to limit their penalty assessments to accuracy-related penalties and a single

"Miscellaneous Offshore Penalty" ("MOP") of $344,545 (*i.e.*, 27.5% of the highest aggregate value

of their assets). *See* Am. Compl. ¶ 6; Gov't. Ex. A; *accord* 2012 OVDP FAQ 7 (eighth bullet point),

*available at* https://perma.cc/XE56-DRMY, *visited* July 17, 2020. Though this was still a substantial

penalty, it reflected a significant reduction from what the IRS might have assessed had it determined

that Plaintiffs acted willfully. Indeed, given that the 2007 year-end balance of Plaintiffs' UBS account

was $1,252,890, Gov't. Ex. B at *2, the maximum penalty for 2007 *alone* could have been $626,445.

*See* 31 U.S.C. § 5321(a)(5)(C).[5]

### c. Streamlined Domestic Procedures and Transitional Treatment

Starting in the latter half of 2013, the IRS began to reevaluate its entire offshore voluntary

disclosure process and how to handle taxpayers with non-willful compliance issues. For genuinely

non-willful OVDP participants, the 27.5% MOP available through OVDP was considerably greater

than the non-willful penalties that they faced if they simply exited OVDP and subjected themselves

to an IRS examination. *See* 31 U.S.C. § 5321(a)(5)(B) (creating "reasonable cause" safe harbor and

---

[5] Although the Court can infer the maximum penalty based on the MOP listed in Exhibit A and the balance listed in Exhibit B, the actual penalty amount is not material to the government's arguments that (1) Plaintiffs voluntarily waived their right to challenge the assessments made through OVDP; (2) a tax refund action brought in compliance with I.R.C. § 7422–rather than an APA suit or free-standing constitutional challenge– is the exclusive means for Plaintiffs to recover their tax penalties and challenge the Transition Rules.

otherwise limiting non-willful penalties to $10,000).  As a consequence, many OVDP participants who were truly confident that they would be deemed "non-willful" opted out of OVDP, forcing the IRS to expend significant resources examining taxpayers who did not have realistic exposure to either civil fraud penalties, civil willful FBAR penalties, or criminal liability. *See generally*, IRS MAKES CHANGES TO OFFSHORE PROGRAMS; REVISIONS EASE BURDEN AND HELP MORE TAXPAYERS COME INTO COMPLIANCE, IR-2014-73, June 18, 2014, *available at* https://perma.cc/5YAS-55YJ, visited July 17, 2020; Am. Compl. ¶ 8.

In June 2014–after Plaintiffs made their disclosures through OVDP but before they executed their Closing Agreement–the IRS announced substantial changes to OVDP.  Am. Compl. ¶¶ 8, 39.  Specifically, the IRS announced new "Streamlined Domestic Procedures" that allowed U.S. taxpayers who self-certified that their conduct was non-willful to pay only a 5% MOP, rather than the 27.5% MOP that was typically available through OVDP.  *See generally* Streamlined Filing Compliance Procedures, *available at* https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures-for-u-s-taxpayers-residing-in-the-united-states-frequently-asked-questions-and-answers (visited July 1, 2020); Am. Compl. ¶¶ 8-9.  Such participants did not receive any assurance against criminal prosecution and did not enter into a Closing Agreement with the IRS. Thus, although participants were not audited automatically, they could still be selected for audit under the IRS's existing selection processes and remained exposed to additional civil or criminal liability, if appropriate.

Taxpayers who (like Plaintiffs) were participating in OVDP as of July 1, 2014 were ineligible for the new Streamlined Domestic Procedures.  Instead, the IRS announced procedures ("Transition Rules") to allow qualifying OVDP participants to incorporate the more lenient 5% MOP into their Closing Agreements.  Am. Compl. ¶ 10.  The IRS made clear that so-called "Transitional Treatment" was not automatic. *See* Am. Compl. ¶¶ 10-11, 47. Those requesting Transitional

Treatment had to self-certify as to their non-willfulness and provide a narrative explanation of their conduct. Am. Compl. ¶ 45; *see also* Transition Rules: Frequently Asked Questions (FAQs), FAQ #6, *available at* https://perma.cc/BWM8-H3KX (visited July 1, 2020). The IRS stated that before it would grant Transitional Treatment, "the IRS must agree that the taxpayer is eligible for transitional treatment and must agree that the available information is consistent with the taxpayer's certification of non-willful conduct." *See* Transition Rules: Frequently Asked Questions (FAQs), FAQ #7 ("Is Transitional Treatment Automatic? No."); Am. Compl. ¶ 47.

### d. IRS's denial of Transitional Treatment; Plaintiffs' allegations of duress

In October 2015 (at the earliest), Plaintiffs certified that their failure to file FBARs was non-willful and requested Transitional Treatment. *See* Am. Compl. ¶ 65; Gov't. Ex. B (certificate of non-willfulness). The IRS denied their request.[6] *See* Am. Compl. ¶ 66. After the IRS denied Plaintiffs' request for Transitional Treatment, Plaintiffs had the choice to opt-out of the OVDP (and have their case resolved through an examination) or continue with OVDP and execute a Closing Agreement. Am. Compl. ¶¶ 66-67. Plaintiffs instead engaged in extensive efforts to convince the IRS to reconsider its decision. The IRS did not change its decision. *See Id.*

On August 15, 2017, the IRS sent Plaintiffs a letter alerting them of their pending removal from the OVDP. *See* Am. Compl. ¶ 68; Gov't. Ex. C[7] (copy of letter, referred to in complaint, sent by IRS to Plaintiffs dated August 15, 2017). The letter went on to explain that "[o]nce we remove

---

[6] Should this suit proceed beyond this motion, the government intends to show that the IRS informed Plaintiffs that their request was denied because the available information was inconsistent with Plaintiffs' certification of non-willfulness.

[7] Exhibit C, which is a copy of the IRS's August 15, 2017 letter to Plaintiffs, is expressly referred to in the complaint and is central to Plaintiffs' claim of duress, as it appears to be the "threat" Plaintiffs perceived to have emanated from the IRS. Am. Compl. ¶¶ 68, 73. Accordingly, the Court can consider the exhibit without converting the motion to one for summary judgment. *E.g. Hinton*, 624 F. Supp. 2d at 46.

you from the voluntary disclosure program, we will start an audit under standard examination

procedures." *See id.*

On February 14 and again on April 5, 2018, the IRS sent Plaintiffs letters informing them

that the IRS intended to remove them from OVDP.  Am. Compl. ¶¶ 69, 70; Gov't. Ex. D[8] (copy of

letter, referred to in complaint, sent by IRS to Plaintiffs dated February 14, 2018); Gov't. Ex. E[9]

(copy of letter, referred to in complaint, sent by IRS to Plaintiffs dated April 5, 2018).  In its April 5,

2018 letter, the IRS explained that:

> [T]he Offshore Voluntary Disclosure Program Transition FAQs
> make clear no appeals process is available for IRS decisions on
> granting or denying Transition requests. Transition FAQ #8 states . .
> . . "If the IRS does not agree that the taxpayer is entitled to
> transitional treatment, the case remains governed by the terms of the
> OVDP in which the taxpayer is participating. In these circumstances,
> if the OVDP miscellaneous offshore penalty is unacceptable to the
> taxpayer, the taxpayer may opt out of the OVDP and choose to have
> the case resolved in an examination process."

Gov't. Ex. E. The IRS further advised that "[a]t this time, the taxpayers have two options. They may

agree by signing the . . . Closing Agreement . . . and submitting full payment of any balance due[,] or

let the removal process continue and the case will be resolved in the examination process." *Id.*

### e.  **Plaintiffs' execution of their Closing Agreement**

On April 6, 2018, Plaintiffs decided against having their case resolved through an IRS

examination (subject to judicial review).  Instead, Plaintiffs submitted their signed Closing

---

[8] Exhibit D, which is a copy of the IRS's February 14, 2018 letter to Plaintiffs, is expressly referred to in the complaint and is central to Plaintiffs' claim of duress, as it appears to be an additional "threat" Plaintiffs perceived to have emanated from the IRS.  Am. Compl. ¶ 70. Accordingly, the Court can consider the exhibit without converting the motion to one for summary judgment. *E.g. Hinton*, 624 F. Supp. 2d at 46.

[9] Exhibit E, which is a copy of the IRS's April 5, 2018 letter to Plaintiffs, is expressly referred to in the complaint and is central to Plaintiffs' claim of duress, as it appears to be an additional "threat" Plaintiffs perceived to have emanated from the IRS.  Am. Compl. ¶ 70. Accordingly, the Court can consider the exhibit without converting the motion to one for summary judgment. *E.g. Hinton*, 624 F. Supp. 2d at 46.

Agreement to the IRS (along with their payment of $380,531.14). Am. Compl. ¶¶ 73-74. The IRS countersigned the Closing Agreement and sent it back on May 21, 2018. *See* Gov't. Ex. A.

## III.   STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In deciding a motion brought under Rule 12(b)(6), the court is restricted from considering matters "outside" the pleadings. *Hinton v. Corr. Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009). "When a moving party introduces 'matters outside the pleadings' in support of a motion to dismiss, Rule 12(d) requires the district court either to ignore that evidence in deciding the motion under Rule 12(b)(6), or to convert the motion into one for summary judgment." *Hurd v. D.C.*, Gov't, 864 F.3d 671, 686 (D.C. Cir. 2017).

Matters that are "inside" the pleadings (and that a court may consider without conversion) include "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint," *Gustave–Schmidt v. Chao*, 226 F.Supp.2d 191, 196 (D.D.C. 2002); *He Depu v. Yahoo! Inc.*, 950 F.3d 897, 901 (D.C. Cir. 2020). The Court can also consider documents upon which the plaintiffs' complaint necessarily relies, even if the document is produced by the defendant and even if the document is neither attached to nor expressly referenced by the complaint. *Strumsky v. Washington Post Co.*, 842 F. Supp. 2d 215, 218 (D.D.C. 2012) (conversion to summary judgment not required to consider retirement plan documents where "plaintiff's entire complaint centers on the retirement benefits that he contends he is entitled to receive"). Were the Court precluded from considering such documents, "a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *E.g. Pension Ben. Guar.*

*Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993);[10] *accord Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

### IV.    ARGUMENT

There are at least three insurmountable barriers to Plaintiffs' attempt to claw back the money that they paid under the Closing Agreement and to force the IRS to settle their tax and penalty claims on more generous terms. The first, and most basic, is that Plaintiffs voluntarily waived the right to challenge the tax and penalty assessments described in the Closing Agreement. The second, as the Supreme Court and the D.C. Circuit have made clear, is that Plaintiffs' sole avenue for recovery is a refund suit–not an APA action or a free-standing 5th Amendment claim. *See Clintwood Elkhorn Min. Co.*, 553 U.S. at 12; *Maze,* 862 F.3d at 1093; *Ass'n of Irritated Residents v. E.P.A.*, 494 F.3d 1027, 1033-34 (D.C. Cir. 2007). And third, Plaintiffs never identify a property interest that is a prerequisite to stating a procedural due process claim (nor do they explain why post-assessment judicial review would constitute insufficient procedural due process).

### a.   This suit is a challenge to the IRS's assessment and collection of Title 26 taxes and penalties

Because of its implications for both waiver and the availability of APA and constitutional remedies, it is critical to acknowledge at the outset what this suit is really about: <u>money</u>. Specifically, this suit is about whether the Plaintiffs are entitled to a refund of some of the money that they voluntarily paid the IRS to settle their tax and penalty liability arising from their multiple violations of the Bank Secrecy Act and Internal Revenue Code.[11]

---

[10] On July 14, 2020, undersigned counsel provided Plaintiffs' counsel with a copy of each of the exhibits attached to this motion to confirm that there was no dispute as to authenticity. To date, Plaintiffs have not notified the government of any such concern.

[11] All of the penalties were assessed under Title 26, including the MOP – a miscellaneous Title 26 penalty in lieu of Title 31 penalties.

Notwithstanding their numerous allegations about how the Transition Rules violate the APA and the Fifth Amendment, the Plaintiffs do not deny that the ultimate goal of this case is a refund of the taxes, penalties and interest that they paid in accordance with the Closing Agreement. To the contrary: the Amended Complaint candidly requests a "refund of all money that Plaintiffs paid to Defendant through their participation in the OVDP's penalty structure," and that the IRS be limited to assessing only a 5% penalty instead. *See* Am. Compl. at *20 (prayer for relief).  There is also little doubt that monetary relief–rather than an injunction–provides the most direct remedy for plaintiffs' alleged injuries.  Indeed, were this Court to order the IRS to refund Plaintiffs the difference between what they actually paid under OVDP and what they would have paid had the IRS approved their request to transition to the 5% penalty, Plaintiffs would have a complete remedy.

Even assuming that Plaintiffs were genuinely preoccupied with challenging the IRS's procedures, a refund action would allow them to do so.  In a nearly identical suit in this Court, the District Court observed:

> Plaintiffs may avail themselves of a second alternative opportunity to pursue these results. They can opt-out of the OVDP, allow the IRS to determine their liabilities by examination, pay the assessed liabilities, and file an administrative claim for a refund for the difference between the liability determined and the amount that would be due under the Streamlined [Domestic] Procedures; if that administrative refund claim is denied, they may then file a refund suit in federal court.

*Maze*, 206 F. Supp. 3d at 20.[12]  In affirming the lower court, the D.C. Circuit echoed the sufficiency of a refund action, and expressly rejected the plaintiffs' contention that "in a refund suit, [plaintiffs]

---

[12] Although the *Maze* court made this observation in the context of challenge under the Anti-Injunction Act, 26 U.S.C. § 7421, there is no principled reason why a refund suit would be an adequate remedy for Anti-Injunction Act purposes, but not an adequate alternative remedy under 5 U.S.C. § 704.

could challenge only the amount of their tax liability, not the Transition Rules themselves." *Maze,* 862 F.3d at 1093 n.6.

In sum, though plaintiffs allegedly take issue with aspects of the Transition Rules, this case is simply not a "challenge[] to an IRS regulation, action, or procedure unrelated to the individual assessment or collection of taxes." *See Starr Int'l Co. v. United States*, 910 F.3d 527, 536 (D.C. Cir. 2018) (quoting *Cohen v. United States*, 650 F.3d 717, 733 (D.C. Cir. 2011)) (emphasis added).  And even if Plaintiffs are solely focused on attacking the Transition Rules, nothing precludes them from seeking a refund on the grounds that the IRS's assessments were erroneously based on Transition Rules that violated the APA (or the Constitution).[13]

### b. Plaintiffs waived their right to litigate the tax and penalty assessments set forth in their Closing Agreement

#### i. Background concerning Closing Agreements

Section 7121 of the Internal Revenue Code authorizes the IRS to enter into a written Closing Agreement with any person relating to the liability of such person in respect of any internal revenue tax for any period. 26 U.S.C. § 7121(a). Closing Agreements enable "taxpayer[s] and the government finally and completely to settle all controversies in respect of the tax liability for any previous taxable period, and to protect . . . taxpayer[s] against the reopening of the matter at a later date, and to prevent the filing of additional claims for refund or the institution of suit for the same

---

[13] Had plaintiffs brought this action under 28 U.S.C. § 1346(a)(1), the Court would lack subject-matter jurisdiction absent allegations that (1) they fully paid taxes for the period for which a refund is sought, *Ryskamp v. Comm'r*, 797 F.3d 1142, 1150–51 (D.C. Cir. 2015), (2) they filed a valid claim with the IRS, *Clintwood Elkhorn Min. Co.*, 553 U.S. at 4; and (3) they have brought suit for refund within two years of the IRS denying their refund claim or after waiting 6 months without action by the IRS. *United States v. Michel*, 282 U.S. 656, 659, (1931); *see also* 26 U.S.C. § 6532(a)(1). Plaintiffs do not allege that they met any of those jurisdictional prerequisites here. *See generally Satterlee v. Comm'r of Internal Revenue*, 195 F. Supp. 3d 327, 337 n.3 (D.D.C. 2016).

purpose by . . . taxpayer[s]." *Wolverine Petroleum Corp. v. Comm'r of Internal Revenue*, 75 F.2d 593, 595 (8th Cir. 1935).

Consistent with the goal of finality, by statute Closing Agreements are "final and conclusive," except "upon a showing of fraud or malfeasance, or misrepresentation of a material fact," 26 U.S.C. § 7121(b). As a consequence, once a matter has been resolved by a Closing Agreement, "(1) the case shall not be reopened as to the matters agreed upon. . . . and (2) in any suit, action, or proceeding, *such agreement, or any determination, assessment, collection, [or] payment . . . made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.*" *Id.* (emphasis added).

Closing Agreements are interpreted under ordinary contract principles. *E.g. Davis v. United States*, 811 F.3d 335, 338-9 (9th Cir. 2016); *United States v. ConocoPhillips Co.*, 744 F.3d 1199, 1204 (10th Cir. 2014); *Ellinger v. United States*, 450 F.3d 1325, 1336 (11th Cir. 2006). Accordingly, taxpayers are "bound by the agreements that they sign, without regard to whether they regret their decisions after the fact." *See Johnson v. Penn Camera Exch.*, 583 F. Supp. 2d 81, 86 (D.D.C. 2008) (non-tax case); *accord Clark v. Comm'r*, 96 T.C.M. (CCH) 448 (T.C. 2008) ("A valid settlement, once reached, cannot be repudiated by either party."). Moreover, because "parties cannot add, subtract, or modify terms outside the agreements themselves," closing agreements are fully integrated agreements, *see Marathon Oil Co. v. United States*, 42 Fed. Cl. 267, 275 (1998), *aff'd*, 215 F.3d 1343 (Fed. Cir. 1999) (per curiam).

### ii. The Closing Agreement unambiguously waived Plaintiffs' right to challenge the tax and penalty assessments described therein

By signing their Closing Agreement, Plaintiffs unambiguously waived their right to challenge the tax and penalty assessments that are the subject of this lawsuit. *See* Gov't. Ex. A at ¶ 9 (stating Plaintiffs "consent to the assessment and collection of the liabilities for tax, interest, additions to tax, and penalties" set forth in the Closing Agreement, and further "agree not to file a refund claim for the underlying tax, penalties, and interest for any amount that relates to the underreported income described in this closing agreement, for any years subject to this closing agreement, on any

grounds"). Indeed, the first six paragraphs of the Closing Agreement specify the taxes and accuracy-related penalties to which Plaintiffs consented, and Plaintiffs further consented to interest on their underpayments in Paragraph 8. And of perhaps greatest import for this case, Plaintiffs *expressly* consented to the IRS's assessment and collection of the 27.5% MOP (for which they now seek a refund):

> In addition to the [accuracy-related civil] penalties under section 6662 of the Internal Revenue Code . . . . and in lieu of any other penalties that the [IRS] may impose with respect to the offshore financial arrangements that were the subject of the voluntary disclosure, Taxpayers agree to pay, and the [IRS] may assess under Title 26 of the United States Code a miscellaneous penalty in the amount of $344,545.00 in taxable year 2010.

*Id.* ¶ 7.

One would be hard-pressed to draft a clearer waiver of a taxpayer's right to challenge his or her assessments than the language in Plaintiffs' Closing Agreement. Between such express language and the finality demanded by § 7121(b), there is no doubt that Plaintiffs have waived their right to bring the instant suit. Accordingly, Plaintiffs cannot state a claim for relief. *See Schmidt v. Shah*, 696 F.Supp.2d 44, 62 (D.D.C. 2010) ("[a] party to a voluntary settlement agreement may waive his or her rights to litigate claims in court").

### iii. Even taken as true, Plaintiffs' factual allegations do not state a prima facie claim for duress

In light of their prior waiver, Plaintiffs attempt to resuscitate their claims by alleging in Count IV that their Closing Agreement was a product of duress and should be set aside as "invalid." Plaintiffs fail, however, to allege that they signed the Closing Agreement due to an improper threat by the IRS (and that they had no reasonable alternative but to sign it). Accordingly, Count IV fails as a matter of law. *Iqbal*, 556 U.S. at 678.

Duress is a recognized defense to contract formation, *e.g. Am. Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir.1986). To state a prima facie claim of duress, a party must allege facts

showing that the "manifestation of assent [was] induced by an improper threat by the other party that leaves the victim no reasonable alternative." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 174, 175 n.7 (D.D.C. 2007) (quoting Restatement (Second) of Contracts § 175 (1981)); *Weaver v. Bratt*, 421 F. Supp. 2d 25, 32 (D.D.C. 2006); *accord King v. Donnkenny, Inc.*, 84 F. Supp. 2d 736, 738 (W.D. Va. 2000) (duress requires "undue pressure" and "improper threat").

Given that duress cases turn on the nature of the alleged threat, it is important to note that simply "[b]eing advised of the natural and probable consequences of one's actions is not duress." *Parker v. N. Carolina Agr. Fin. Auth.*, 341 B.R. 547, 554 (E.D. Va. 2006) (no duress where party informed that failure to reach agreement could result in home foreclosure). That is because, by "definition, all defendants considering settlement do so based upon consideration of the adverse consequences that might result if the action proceeds and they do not prevail on the merits." *Am. Sec. Vanlines, Inc.*, 782 F.2d at 1061; *accord Wright v. Eastman Kodak Co.*, 445 F. Supp. 2d 314, 319 (W.D.N.Y. 2006) ("That this choice [to settle] is often difficult to make does not mean that it is made under duress.").

The Amended Complaint does not plead a prima facie claim for rescission (based on duress) because it does not allege that the IRS took any actions that could reasonably be construed as a threat (improper or otherwise). At most, the Amended Complaint alleges that the IRS sent Plaintiffs three letters reminding them of the "natural and probable consequences" of failing to complete OVDP by executing a Closing Agreement: their case would be resolved through an IRS examination. Am. Compl. ¶¶ 68 (citing Gov't. Ex. C), 69 (citing Gov't Ex. D), & 70 (citing Gov't. Ex. E). The fact that exiting OVDP and undergoing an examination *might* result in Plaintiffs being assessed congressionally-authorized criminal or civil penalties in excess of those assessed in OVDP, *see* Am. Compl. ¶ 7, does not constitute an "improper threat" as a matter of law. *Parker*, 341 B.R. at 554; *Am. Sec. Vanlines, Inc.*, 782 F.2d at 1061.

Though Plaintiffs' allegations, as drafted, seem to blur the line between the actual *content* of the IRS's letters and Plaintiffs' *subjective reaction* to those letters, a cursory review of the IRS's correspondence resolves any ambiguity.  These exhibits, which are expressly incorporated into the Amended Complaint and essential to Count IV, make clear that the IRS did not threaten to assess "catastrophic penalties," Am. Compl. ¶ 68, or to "seize all of [Plaintiffs'] assets and savings," Am. Compl. ¶ 71. Though Plaintiffs may have felt some financial or other pressure to put their FBAR violations behind them, such pressure, *without more*, is insufficient to state a claim for duress. *See Brees v. Hampton*, 877 F.2d 111, 118 (D.C. Cir. 1989).

Plaintiffs similarly fail to allege that they lacked a "reasonable alternative" to signing the Closing Agreement.  *Wright*, 503 F. Supp. 2d at 175 n.7 (dismissal for failure to state a claim appropriate where Plaintiff failed to allege facts showing improper threat or lack of alternative). As noted, Plaintiffs had the option of withdrawing from OVDP and having their case resolved through an IRS examination–a process that could result in penalties less than the 27.5% MOP (or no assessed penalties at all). Even if an examination resulted in the IRS assessing willful FBAR penalties (notwithstanding Plaintiffs' contention that they did not act willfully in failing to report their Swiss bank account), Plaintiffs would *still* have had the option of challenging those penalties in federal court.  The Amended Complaint simply fails to allege how or why such alternative avenues of relief were so unreasonable that Plaintiffs had no choice but to sign the Closing Agreement.

For all these reasons, the Court should dismiss Count IV for failure to state a claim for duress. The Court should further hold that Plaintiffs waived their right to challenge the tax and penalty assessments set forth in their Closing Agreement.

### c.   Plaintiffs fail to state a claim for relief under the Administrative Procedure Act

#### i.   Plaintiffs cannot state a claim under the APA because (but for their Closing Agreement) a refund action would provide an adequate remedy in court

An APA challenge is, in a sense, a claim of last resort. By its terms, APA relief is only available if there is "no other adequate remedy in a court." 5 U.S.C. § 704; *see also Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017) (holding that § 704 is not a limit on the waiver of sovereign immunity, but is "instead an element of the cause of action created by the APA.").

Because this case is, at base, a tax refund action, the Plaintiffs cannot state a claim under the APA. *See Starr Int'l Co.*, 910 F.3d at 536; *Perry Capital LLC*, 864 F.3d at 620. It does not matter that plaintiffs scrupulously avoided referring to either of the statutes related to federal tax refund jurisdiction (*i.e.*, 28 U.S.C. § 1346(a)(1) or 26 U.S.C. § 7422). "The fact that the plaintiff has framed its complaint as a request for an injunction or a declaratory judgment as opposed to a request for damages does not require that the case be treated as arising under the APA." *See Doe v. United States*, 372 F.3d 1308, 1313 (Fed. Cir. 2004). The artful pleading doctrine requires the Court to determine "[i]f the suit is at base a claim for money, and . . . a money judgment . . . will provide an adequate remedy, the inquiry is at an end." *See Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1125 (Fed. Cir. 2007).[14]

Here, there is little doubt that this action is a "suit or proceeding . . . in any court for the recovery of any revenue tax alleged to have been erroneously or illegally assessed or collected . . . . or

---

[14] Although *Doe* and *Suburban Mortgage* involved the availability of APA relief where the Plaintiff could have brought suit for money damages under the Tucker Act, 28 U.S.C. § 1491(a)(1), the reasoning would apply with equal force where the alternative to APA relief is available under 28 U.S.C. § 1346(a)(1) (providing concurrent jurisdiction in the Court of Federal Claims and U.S. district courts for actions seeking the "recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws").

of any sum alleged to have been . . . . in any manner wrongfully collected." 26 U.S.C. § 7422(a). One

only need look to the "Wherefore" clause of the Amended Complaint to see that Plaintiffs are

requesting a refund of the payments made in accordance with the Closing Agreement. Accordingly,

the Court should hold that this suit is a tax refund action, and that Plaintiffs are precluded from

APA relief.  And because Plaintiffs have not set forth the allegations necessary to state a refund

claim in compliance with 26 U.S.C. § 7422 (*e.g.*, administrative claim for refund, denial), the Court

should dismiss the complaint for lack of jurisdiction.  *See Clintwood Elkhorn Min. Co.*, 553 U.S. at 12.

Notably, requiring taxpayers to follow the congressionally-mandated refund procedure does

not mean that they cannot challenge the IRS's assessments on the grounds that the assessments

were based on regulations that violate the APA or their right to procedural due process. Congress,

the Supreme Court, and the D.C. Circuit have all made clear, however, that a taxpayer seeking to

challenge the IRS's decision to assess or collect a tax must bring their challenge under 28 U.S.C.

§ 1346(a)(1) and in conformance with 26 U.S.C § 7422. *See Clintwood Elkhorn Min. Co.*, 553 U.S. at 12

(even constitutional challenges to tax assessments must be brought in a refund suit in compliance

with 26 U.S.C. § 7422); *Maze*, 862 F.3d at 1093, n.6 (agreeing that challenge to regulation can be

brought in a refund suit); *see also Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065, 1067

(D.C. Cir. 2015) ("To be clear, our ruling does not prevent a [party] from obtaining judicial review of

the challenged regulation."); *Larson v. United States*, 888 F.3d 578, 587 (2d Cir. 2018) ("Congress has

treated tax claims differently and has provided for post-payment judicial review of assessed taxes in

district court with a few explicit exceptions.").

In sum, because this suit is a challenge to the assessment and collection of federal taxes and penalties, Plaintiffs can only pursue their claims in a refund action brought in compliance with 26 U.S.C. § 7422.  Having failed to do so, the Court must dismiss the Complaint in its entirety.[15]

> ## ii. Plaintiffs cannot state a claim under the APA because the Transition Rules do not constitute "final agency action"

The Amended Complaint alleges that the Transition Rules had "the force and effect of law." Am Compl. ¶ 55.  Presumably Plaintiffs raise this *legal* allegation, which need not be assumed true at the Rule 12 phase, in the hope that the Court will construe the Transition Rules as "substantive rules" that are both final (for § 704 purposes) and for which the APA would require notice-and-comment rulemaking.  Plaintiffs are mistaken on both counts.

The APA only provides review of "final agency action." 5 U.S.C. § 704.  "As a general matter, two conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).

At most, the Transition Rules marked the "consummation" of the IRS's decision to establish procedures for triaging taxpayer requests to settle Title 26 and Title 31 violations for less than the statutory maximum (and less than the OVDP's 27.5% MOP).  Yet the Transition Rules plainly did not mark the consummation of the IRS's assessment or collection process, nor did they "determine

---

[15] The fact that Plaintiffs (via their Closing Agreement) voluntarily waived their right to bring a refund action does not mean that "no other remedy exists" for § 704 purposes.  Section 704 does not allow litigants to bootstrap themselves up to an APA claim by waiving the "other adequate remedies" that Congress created (and mandated be used).

rights or obligations." The Transition Rules did not, for example, guarantee OVDP participants that they would receive transitional treatment. To the contrary, FAQ #7 stated that Transitional Treatment was not automatic.[16]

Because the Transition Rules did not bind the IRS to a particular course of action, it is irrelevant that, as a practical matter, the Transition Rules made it more likely that some taxpayers would enter into a binding Closing Agreement that reduced their penalty liability to a 5% MOP. Though in a different context, the D.C. Circuit has observed that, "if the practical effect of the agency action is not a certain change in the legal obligations of a party, the action is non-final for the purpose of judicial review," *see National Ass'n of Home Builders v. Norton*, 415 F.3d 8, 15, 367 (D.C. Cir. 2005); *cf. DRG Funding Corp. v. Sec'y of Housing and Urban Dev.*, 76 F.3d 1212, 1214 (D.C.Cir.1996) (agency order non-final that "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action").

### iii. Plaintiffs cannot state a claim under the APA because the Transition Rules constitute a presumptively unreviewable exercise of enforcement discretion (rather than rulemaking)

The issuance of documents related to whether and how an agency intends to settle civil or criminal matters constitutes agency "enforcement activity," rather than rulemaking. *Irritated Residents* 494 F.3d at 1033-34 (EPA's publication of generic consent decree template to settle claims with members of pork and poultry industry constituted unreviewable enforcement action, not rulemaking). Such enforcement activities are generally committed to agency discretion, and thus presumptively unreviewable under D.C. Circuit precedent applying *Heckler v. Chaney*, 470 U.S. 821

---

[16] Moreover, the Transition Rules should not be read in isolation, but rather part of a broader voluntary settlement framework that retained the IRS's ability to examine taxpayers under ordinary procedures and impose additional civil or criminal liability.

(1985).  Because the Transition Rules constitute an exercise of the IRS's broad discretion to set forth procedures for resolving tax and penalty liabilities, Plaintiffs cannot state a claim under the APA.

### 1.   *The APA excepts "action committed to agency discretion" from judicial review*

The APA's waiver of sovereign immunity is not available for suits challenging "agency action . . . committed to agency discretion by law."  *See* 5 U.S.C. § 701(a)(2) (limiting applicability of the APA).  Accordingly, an agency's decision to settle civil or criminal claims, like the decision to initiate or forgo enforcement action, is presumptively unreviewable under the APA.  *See, e.g., Chaney*, 470 U.S. at 831 (Food and Drug Administration's decision not to institute proceeding against drug manufacturer not reviewable); *Irritated Residents*, 494 F.3d at 1033 (EPA's settlement program and publication of generic consent decree not reviewable); *cf. Connecticut Dep't of Children & Youth Servs. v. Dep't of Health & Human Servs.*, 9 F.3d 981, 984 (D.C. Cir. 1993) (stating in dicta that agency statements regarding enforcement criteria are presumptively unreviewable unless they "change the normative standards under which the statute operates").

To determine whether judicial review is available, courts look to "both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action."  *Sierra Club v. U.S. Fish & Wildlife Serv.*, 930 F. Supp. 2d 198, 204 (D.D.C. 2013); *see also Webster v. Doe*, 486 U.S. 592, 600 (1988) (stating in dicta that courts must carefully examine the statute on which claim of illegality is based).  If "[n]one of the statutes' enforcement provisions give any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another . . . . [then the decisions] about whether and how to enforce the Acts against certain [violators] are left to the discretion of the agency."  *Irritated Residents,* 494 F.3d at 1033; *accord Sierra Club v. Jackson*, 648 F.3d 848, 856-57 (D.C. Cir. 2011).

2.   *Whether (and how) to settle a tax claim is committed to the IRS's discretion*

The IRS's authorizing statutes demonstrate that its decision to establish the Offshore Voluntary Disclosure Programs, including the Streamlined Programs and Transitional Treatment, constituted an exercise of its discretionary enforcement authority, which is presumptively unreviewable under the APA.  *See* 26 U.S.C. 7121(a) (for Closing Agreements, "[t]he Secretary *is authorized to enter into an agreement in writing* with any person relating to the liability of such person") (emphasis added); 26 U.S.C. § 7122  (for offers in compromise, "[t]he Secretary *may* compromise any civil or criminal case arising under the internal revenue laws") (emphasis added);  26 U.S.C. § 7401 ("No civil action for the collection or recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced *unless the Secretary authorizes or sanctions the proceedings*") (emphasis added); 26 U.S.C. § 7403 ("the Attorney General or his delegate, *at the request of the Secretary*, may direct a civil action to be filed in a district court).  Nothing in these statutes suggests that Congress intended to intrude upon the "special province of the Executive Branch" to enforce Federal tax law.  *See Chaney*, 470 U.S. at 832.

The regulations that allow the IRS to enter into binding agreements are drafted in similarly broad terms.  This is true for Closing Agreements, 26 C.F.R. § 1.7121-1(a) ("The Commissioner *may enter* into a written agreement with any person"), as well as offers in compromise, 26 C.F.R. § 301.7122-1(c) (" the decision to accept or reject an offer to compromise, as well as the terms and conditions agreed to, is left to the discretion of the Secretary."); 26 C.F.R. § 301.7122-1(b)(3)(i) ("a compromise *may* be entered into to promote effective tax administration when the Secretary determines that, although collection in full could be achieved, collection of the full liability would cause the taxpayer economic hardship. . . ."); 26 C.F.R. § 301.7122-1(b)(3)(ii) ("the IRS *may* compromise to promote effective tax administration where compelling public policy or equity considerations identified by the taxpayer provide a sufficient basis for compromising the liability.") (emphasis added).

The applicable regulations also provide the IRS with broad discretion to craft requirements for how delinquent taxpayers may submit offers to settle tax claims through offers in compromise. Specifically, 26 C.F.R. § 301.7122-1 provides:

> An offer to compromise a tax liability pursuant to section 7122 *must be submitted according to the procedures, and in the form and manner, prescribed by the Secretary.*  An offer to compromise a tax liability must be made in writing, must be signed by the taxpayer under penalty of perjury, and must contain all of the information prescribed or requested by the Secretary.

26 C.F.R. § 301.7122-1(d) (emphasis added).

In sum, it is clear that the relevant statutes and regulations provide no "judicially manageable standards" by which a court could review the IRS's creation of the offshore settlement initiatives, or the publication of any particular procedures or instructions thereunder.[17]  *See Chaney*, 470 U.S. at 830. Indeed, these programs reflect the product of careful balancing of competing compliance priorities and limited resources that is not susceptible to judicial review.  *Id.* at 831-32.

> 3.  The D.C. Circuit's 2007 Decision in Association of Irritated Residents v. E.P.A. requires dismissal of Plaintiffs' APA challenge

To the extent that the foregoing analysis left any doubt, the D.C. Circuit's decision in *Irritated Residents* 494 F.3d 1027, makes clear that Plaintiffs cannot prevail on a facial challenge to the IRS's Transition Rules.

*Irritated Residents* arose from the EPA's publication of a settlement initiative to resolve pork and poultry farms' past and ongoing violations of the Clean Air Act and other statutes in exchange for each participant's: (a) payment of a specified civil penalty based on the size of the farm; and

---

[17] This is not to say that the Service has unfettered settlement discretion.  Indeed, the APA permits suits raising colorable constitutional claims.  *See Webster*, 486 U.S. at 603. ("where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear."); *Royer v. Fed. Bureau of Prisons*, 933 F. Supp. 2d 170, 182 (D.D.C. 2013).  As explained elsewhere in this brief, however, Plaintiffs fail to state a claim for a constitutional injury, nor do they allege that the IRS failed to faithfully apply the Transition Rules to the Plaintiffs.

(b) funding and participation in a study to develop new enforcement standards.  *Id.* at 1028-30.

Participation in the initiative was voluntary, however, and farms that chose not to sign a consent

agreement remained subject to potential enforcement action by EPA, "as would any [participant]

that sign[ed] the Agreement but later drop[ped] out by not complying with the terms of the

Agreement."  *Id.*; 70 FR 4958-59.

In their APA challenge, the petitioners (mostly community and environmental groups)

asserted[18] "that the agreements [were] rules disguised as enforcement actions, that EPA did not

follow proper procedures for rulemaking, and that EPA exceeded its statutory authority by entering

into the agreements." *Irritated Residents*, 494 F.3d at 1028.  The D.C. Circuit held that the EPA's

settlement initiative constituted a non-reviewable exercise of its enforcement authority, rather than

rulemaking, and dismissed the case. Relying on the Supreme Court's guidance in *Chaney*, the panel

viewed the EPA's settlement program as reflective of the agency's careful analysis of whether and

how to engage in discretionary enforcement activity:

> EPA could have pursued enforcement actions against each individual
> [polluter], but determined that a broader strategy would lead to
> quicker industry-wide compliance.  These judgments—arising from
> considerations of resource allocation, agency priorities, and costs of
> alternatives—are well within the agency's expertise and discretion.

*Id.* at 1031-32.[19]

---

[18] The petitioners in *Irritated Residents* challenged *both* the creation of the AFO settlement initiative *and* EPA's execution of separate consent agreements with individual polluters. *See* 494 F.3d at 1030 (listing ten challenged actions including ((1) the announcement of the availability of the consent agreement; (2) the extension of the sign-up and comment period, (3) the publication of the agency's responses to the comments, and (4-10) seven final orders approving batches of consent agreements).

[19] The D.C. Circuit additionally held that the EPA's settlement program did not rise to the level of legislative rulemaking, which further rendered moot any argument that the EPA had failed to engage in notice-and-comment or that the agreement itself was arbitrary or capricious. *Id.* at 1033-37.  If the Court denies the United States' instant motion to dismiss, the United States intends to move for summary judgment and argue, *inter alia*, that the Transition FAQs do not constitute a legislative rule.

There is no meaningful distinction between the offshore settlement initiatives at issue here (including the Transition Rules) and the settlement program at issue in *Irritated Residents*. In both cases, the agency was driven to create a settlement program in light of its scarce resources and the impossibility of pursuing all individual violators. In both cases, the agency enjoyed and retained broad discretion under the applicable statutes and regulations to decide whether and how to pursue violators. Indeed, the relevant regulations authorize the IRS to prescribe the procedures by which settlement offers will be submitted. 26 C.F.R. §§ 301.7121-1(d); 301.7122-1(d). Put simply, because the IRS's statutory and regulatory enforcement provisions do not "give any indication that violators must be pursued in every case, or that one particular enforcement strategy must be chosen over another," the plaintiffs cannot rebut the presumption of non-reviewability. *Irritated Residents*, 494 F.3d at 1033. Accordingly, Plaintiffs cannot state a claim challenging the Transition Rules under the APA.[20]

### d.  Plaintiffs do not state a claim for relief under the Fifth Amendment

Count III alleges that the Transition Rules violate the 5th Amendment's protection against the denial of life, liberty, or property by the government without Due Process. *See* Am. Compl. ¶¶ 47-50, 88-92. These allegations fall into essentially two categories of procedural violations. The first is that the Transition Rules provide insufficient guidance about the criteria and procedures the IRS would use to decide to grant or deny requests for Transitional Treatment. The second is that the Transition Rules did not provide for any administrative appeal rights. As explained below

---

[20] In the absence of an *en banc* decision, there remains considerable uncertainty as to whether an APA claim seeking review of an action committed to agency discretion should be dismissed for lack of jurisdiction or for failure to state a claim upon which relief can be granted. *Compare Sierra Club*, 648 F.3d at 854-55 (dismissing pursuant to Rule 12(b)(6)), *with Irritated Residents*, 494 F.3d at 1033 (dismissing pursuant to Rule 12(b)(1)); *Baltimore Gas & Elec. Co. v. F.E.R.C.*, 252 F.3d 456, 458 (D.C. Cir. 2001) ("The ban on judicial review of actions 'committed to agency discretion by law' is jurisdictional"). Accordingly, the United States' motion should be read as arguing, in the alternative, that plaintiffs' complaint should be dismissed for lack of jurisdiction.

Plaintiffs have not–indeed, cannot–establish that the Transitional Rules violated their right to due process.

The Amended Complaint reflects a fundamental misunderstanding about the nature of the guarantee created by the Due Process Clause. The Clause "does not exist to provide process as an end unto itself; it exists to provide adequate process where government threatens a judicially cognizable interest in life, liberty, or property." *Marciano v. Shulman*, 795 F. Supp. 2d 35, 41 (D.D.C. 2011) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). To state a claim for relief, Plaintiffs must "identify a liberty or property interest upon which the IRS has intruded such that the Clause's protections are triggered." *Marciano*, 795 F. Supp. 2d at 41; *see also NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) ("If no protected interest exists, no due process claim exists.").

The only theoretical "property interest" Plaintiffs could be claiming was the possibility of a civil penalty assessment no greater than the 5% MOP. Generally speaking, however, there is no right to have a law enforcement agency settle according to a particular process or on particular terms offered to other violators. *See Bunce v. United States*, 28 Fed. Cl. 500, 510 (Fed. Cl. 1993), *aff'd*, 26 F.3d 138 (Fed. Cir. 1994) ("Settlement discretion … is at its heart a discretion to treat similarly situated taxpayers differently."); *cf. Dewees v. United States*, 767 F. App'x at 8 (stating in context of equal protection challenge that "we must uphold the government's imposition of different penalties under the Disclosure Program and the Streamlined Program if there is any reasonably conceivable state of facts that could provide a rational basis for it") (internal quotations omitted). In contrast to tax liabilities attributable to partners in a partnership, where Congress has imposed on the IRS a duty of consistency with respect to settlements, Congress has imposed no such duty of consistency for the taxes, penalties, and interest at issue here. *See* 26 U.S.C. § 6224(c) (duty of consistency with respect to partnerships).

Plaintiffs' "interest" in a 5% MOP is too contingent to be cognizable. To have a protected property interest in a given benefit, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972); *see also Roberts v. United States*, 741 F.3d 152, 161-62 (D.C. Cir. 2014); *Tingzi Wang v. U.S.C.I.S.,* 375 F. Supp. 3d 22, 40-41 (D.D.C. 2019) (visa applicant did not have any Due Process property or liberty interest "in the proper adjudication of his visa" application). A "benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005). And the complaint itself alleges that the Transition Rules provide the IRS discretion to grant or deny transition requests.[21] Indeed, Count III explicitly alleges that the Transition Rules do *not* include any "guidance," "criteria," and "factors" that would limit the IRS's discretion in determining whether to grant or deny Transition treatment.[22] *See* Am. Compl. ¶¶ 48, 89, 92.

An additional reason that the Transition Rules fail to create any property right in favor of the Plaintiffs is that the procedures described therein "were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion. *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538 (1970). To the contrary, by providing a path for non-willful OVDP participants to remain in OVDP (or exit or avoid OVDP altogether), the Transition Rules

---

[21] Tellingly, the Amended Complaint does not allege that the IRS's denial was inconsistent with the Transition Rules, which specified that the IRS would not grant a request unless "the available information is consistent with the taxpayer's certification of non-willful conduct." Transition Rules: Frequently Asked Questions (FAQs), FAQ #7.

[22] Settled law drawn from a variety of contexts shows that Count III fails to allege the required "property" interest. *Raven v. Sajet*, 334 F. Supp. 3d 22, 33 (D.D.C. 2018) (applicant had no property interest that might require a "fair hearing" for his application); *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 45 (D.D.C. 2018) (where decision is "committed to discretion of the agency by law," no property or liberty interest may exist for due process purposes).

and the Streamlined Domestic Procedures had the purpose and effect of reducing the resources that IRS had been spending auditing non-willful OVDP participants who otherwise would have opted-out of OVDP to avoid the 27.5% MOP.

Lastly, the IRS provided ample procedural protections to taxpayers denied Transitional Treatment in the form of an administrative examination whose results are subject to an administrative appeal and post-assessment judicial review. The Supreme Court has unambiguously held that such procedures do not violate due process. *See, e.g., Bob Jones Univ. v. Simon*, 416 U.S. 725, 746 n.20, 746-48 (1974) ("The Court dismissed out of hand similar contentions [that post-assessment judicial review violated due process] nearly 60 years ago, and we find such arguments no more compelling now than then."); *cf. Dewees*, 767 F. App'x at 7 ("But the Due Process Clause does not demand that taxpayers be given three chances before paying up."). Indeed, had Plaintiffs opted out of OVDP and had their case resolved through an examination, they might have convinced the IRS to either assess a penalty *lower* than even the 5% MOP–or no penalty at all. 26 U.S.C. § 5321(a)(5)(B) (safe harbor for reasonable cause). And even if the IRS had assessed willful FBAR penalties, Plaintiffs could have paid those penalties and sued for a refund in federal court.

In sum, even assuming Plaintiffs had a cognizable property interest in capping their penalty liability at the 5% MOP (and they did not), the IRS's existing procedures provided Plaintiffs with adequate due process. As this Court recently held, "[m]ere postponement of an opportunity to challenge the imposition of a tax penalty 'is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate.' *Dewees*, 272 F. Supp. at 101 (quoting *Phillips v. Comm'r of Internal Revenue*, 283 U.S. 589, 596-97 (1931)). Although the Amended Complaint pleads that the Transition Rules are procedurally infirm, a "plaintiff is not entitled to perfect procedures or the procedures of his choice." *Bagenstose v. D.C.*, 503 F. Supp. 2d 247, 257 (D.D.C. 2007), *aff'd* 2008 WL 2396183 (D.C. Cir. May 27, 2008). Accordingly, the Court should dismiss

Count III for failure to state a claim for relief.

## V.   CONCLUSION

The Court should grant the government's motion to dismiss, and hold that (1) Plaintiffs cannot state a claim for relief because they voluntarily waived the claims at issue here by signing their Closing Agreement; (2) Plaintiffs have not alleged the jurisdictional facts necessary to state a refund claim; (3) Plaintiffs cannot state a claim for relief under the APA because (but for their waiver) a refund action would provide an adequate remedy in court, the Transition Rules are not final agency action subject to APA review, and the Transition Rules constitute a presumptively non-reviewable exercise of enforcement discretion).  The Court should also dismiss Plaintiffs' due process claim because of Plaintiffs' failure to identify any cognizable property interest in having their case resolved through Transitional Treatment, and because the availability of an administrative exam and post-assessment judicial review is adequate process for purposes of the Fifth Amendment's Due Process Clause.

DATE: July 17, 2020

<div style="margin-left: 40%;">

Respectfully submitted

MICHAEL R. SHERWIN
Acting United States Attorney

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General

_____

RICHARD J. HAGERMAN
JOSEPH E. HUNSADER
Trial Attorney
United States Department of Justice
Tax Division
202-598-7827
555 4th Street
Suite 6836
Washington, D.C. 20044
Richard.J.Hagerman@usdoj.gov

</div>