IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA


ROBERT HARRISON, *et. al*                )
                                          )  Case No. 1:20-cv-828
          Plaintiffs,                     )
                                          )
          v.                              )
                                          )
INTERNAL REVENUE SERVICE, *et. al*        )
                                          )
          Defendants.                     )
_____       )


**PLAINTIFFS' OPPOSITION TO UNITED STATES' MOTION TO DISMISS
PLAINTIFFS' COMPLAINT**

## Table of Authorities

**Cases**

*Am. Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986)            13

*Anaheim v. FERC*, 723 F.2d 656, 659 (9th Cir.1984)                                      6

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)                                         18

*Board of Regents v. Roth,* 408 U.S. 564 (1972)                                         27

*Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988).          4

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)
23

*City of Gillette, Wyo. v. FERC*, 737 F.2d 883 (10th Cir.1984)                           11

*City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003)                           26

*Cohen v. United States*, 578 F.3d 1, 4 (D.C. Cir. 2009)                                17

*Columbia Broadcasting System v. United States*, 316 U.S. 190, 63 S.Ct. 997 87 L.Ed. 1344
    (1943)                                                                             18

*Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1312 (D.C. Cir. 2013)             26

*Ditch-Liners, Inc. v. Pablo,* 670 F.2d 139 (9th Cir.1982)                              21

*Dixon v. Love*, 431 U.S. 105, 114 (1977).                                              27

*Fruhauf Southwest Garment Co. v. United States*, 111 F.Supp. 945, 951 (Ct.Cl. 1953).   13

*Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386 (2014)           11

*Irritated Residents v. E.P.A*, 494 F.3d 1027, 1029 (D.C. Cir. 2007)                    25

*Matlovich v. Secretary of Air Force,* 591 F.2d 852, 857 (D.C.Cir.1978)                 11

*Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. 1, 13-15 (1978).                 27

*PepsiCo, Inc. v. Federal Trade Commission*, 472 F.2d 179 (2d Cir.1972), cert. Denied 414 U.S.
    876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973)                                             19

*Roelofs v. Secretary of Air Force*, 628 F.2d 594 (D.C.Cir.1980)                        11

*Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L. Ed. 2d 714 (1985)    20, 21, 22

**Statutes**

28 U.S.C. Section 1346(a)(1)                                                          3, 11

31 C.F.R. Section 1010.350(a), (b)                                                       2

31 U.S.C. Section 5321(a)(5)(C)                                                         13

5 U.S.C. Section 553(b)                                                                  5

5 U.S.C. Section 555(e)                                                                 10

5 U.S.C. Section 702                                                                 3, 5, 16

5 U.S.C. Section 704                                                                    16

5 U.S.C. Section 706                                                                    20

26 U.S.C. Section 7121(a)                                                               13

Restatement (Second) of Contracts Section 175 (1981) ................................................. 13

**Other Authorities**

28 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts*, Section 71:8 (4th ed. 2000) ................................................. 13

Charles Rettig, *Zwerner: Jury Determines 150% FBAR Penalty Applies- What Next?*, Forbes (May 29, 2014) ................................................. 14

Jaime Arora, *Don't Hastily Join Streamlined Compliance Program, Keneally Say*s, Tax Notes, 74 Tax Notes Int'l 1206 (June 30, 2014) (quoting IRS official Jennifer Best) ................................................. 7

Kristin E. Hickman, *Coloring the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 NOTRE DAME L. REV. 1727, 1728 (2007) ................................................. 5

National Taxpayer Advocate, *Objectives Report to Congress, IRS Responses and National Taxpayer Advocate's Comments Regarding Most Serious Problems Identified in the 2014 Annual Report to Congress*, Vol. 2, at 28 (2016) ................................................. 25

Statement from IRS Commissioner Doug Shulman of Offshore Income (Mar. 26, 2009), available at https://www.irs.gov/uac/Statement-from-IRS-Commissioner-Doug-Shulman-on-Offshore-Income ................................................. 6

Tom Greenaway, *The IRS and the APA: Denial Is Not a Strategy*, Tax Notes, January 8, 2018, pg. 247 ................................................. 10

Transition Rules FAQ, at No.1 ................................................. 7

Transition Rules FAQs, at No. 6 ................................................. 7

Transition Rules FAQs, at No. 8 ................................................. 8, 27

Transition Rules FAQs. at No. 7 ................................................. 8

Plaintiffs Robert Harrison, *et al* hereby oppose Defendant's Motion to Dismiss and show that this action is properly before this Court and should not be dismissed, as follows:

## PRELIMINARY STATEMENT

Plaintiffs Robert Harrison and Julianna Sprinkle are hard working middle class United States citizens.  In the early 2000's, Plaintiffs were stationed in Italy while Plaintiff Julianne Sprinkle was serving in the U.S. Army.  In 2002, Plaintiffs transferred *previously U.S. taxed* (emphasis added) savings of approximately $800,000 to a United Bank of Switzerland ("UBS") account in Europe to support their dream of residing in Italy after Plaintiff Julianne Sprinkle was discharged from the U.S. Army.  At the time, neither of the Plaintiffs understood the tax and compliance implications of establishing such an account. The Plaintiffs did not know foreign financial accounts were required of all American citizens, even those living abroad temporarily or longer-term. *See* 31 C.F.R. Section 1010.350(a), (b).  As a result of reading a number of articles in various newspapers, in 2013 Plaintiffs discovered for the first time they should have disclosed the UBS account on their individual income tax returns and on FBAR informational returns. Once Plaintiffs determined that they incorrectly filed their tax returns in previous years, they immediately took action to resolve their oversight.  While attempting to transition from the Internal Revenue Service ("IRS") Offshore Voluntary Disclosure Program ("OVDP") to the IRS's Streamlined Program, Plaintiffs encountered continued rejections without reason by the IRS.  Ultimately,  Plaintiffs signed an OVDP Closing Agreement with the IRS.

## ARGUMENT

As basis for its Motion to Dismiss Plaintiffs' suit, Defendants contend: 1) Plaintiffs suit is in essence a refund suit for money and not an Administrative Procedure Act ("APA") claim; 2) Plaintiffs voluntarily waived the right to challenge the tax and penalty assessment when they signed a Closing Agreement;  and 3) Plaintiffs fail to state a claim for relief under the APA  *See* '*United States Motion to Dismiss Plaintiffs' Complaint* (ECF No 16) ("Def Motion"), pg. 13-31.

Plaintiffs oppose each of Defendants' arguments in the order set forth in Defendants' Motion to Dismiss for the reasons discussed in detail below.

## A.  The Fact that the Plaintiffs' Action May Require the Defendants to Transfer Money Does Not Prevent Them From Proceeding With an APA Suit

Defendants claim that this suit is really about money and thus this case cannot be prosecuted under the APA. Defendants further argue that the Plaintiffs should have brought this action under 28 U.S.C. Section 1346(a)(1), as a refund suit. *See* Def Motion, pg 13.  Contrary to Defendants' assertions, the fact that the Plaintiffs are demanding a return of their property (along with other relief) does not make this case about money so as to prevent the Plaintiffs from proceeding with suit under the APA. While the waiver of sovereign immunity under 5 U.S.C. Section 702 generally applies to non-monetary cases, "the fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the action as money damages." *See Bowen v. Massachusetts*, 487 U.S. 879, 893, 108 S.Ct. 2722, 2731, 101 L.Ed.2d 749 (1988). In *Bowen v. Massachusetts*, the state sued the Secretary of Health and Human Services for coercive (declaratory and injunctive) relief, in the form of an order requiring the agency to reimburse the state with six million medicare dollars that had been "disallowed." [1] The agency

---

[1] 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988).

claimed that this relief was barred by sovereign immunity. The state, however, claimed the

sovereign immunity had been waived by Section 702 of the APA. The Court agreed with the

state, stating that:

> "Our cases have long recognized the distinction between an action at law for damages-
>
> which are intended to provide a victim with monetary compensation for an injury to his
>
> person, property, or reputation- and an equitable action for specific relief- which may
>
> include an order providing for the reinstatement of an employee with back pay, or for
>
> "the recovery of specific property or monies…." [2]

In this case, the Plaintiffs are seeking declaratory relief stemming from the

non-transparent, arbitrary and capricious manner in which Defendant  administered its Transition

Rules.  A return of money to Plaintiffs, if any, does not change the nature of their lawsuit.

**1. Since the Defendants Violated the APA Rulemaking Requirements, This Action Should**

**Proceed as an APA Case**

Generally, when it comes to tax cases, a district court has limited jurisdiction: it may hear

cases involving disputed funds only after a petitioner has exhausted the refund procedures found

in the Internal Revenue Code. Otherwise, a party must have been "adversely affected or

aggrieved by agency action within the meaning of a relevant statute." *See* 5 U.S.C. Section 702.

This is an extraordinary case that falls under this Court's federal question jurisdiction. One of the

issues in this case is whether the IRS complied with the relevant provisions of the 5 U.S.C.

Section 553. Agencies are given discretion to dispense with notice (and consequently with public

---

[2] 487 U.S. at 893, 108 S.Ct. at 2731-2732.

proceedings) in the case of interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice - all of which do not impose new "courses of conduct for the future." *See* 5 U.S.C. Section 553(b). The APA encourages public participation in an agency's rulemaking process. *See* Kristin E. Hickman, *Coloring the Lines: Examining Treasury's (Lack of) Compliance with Administrative Procedure Act Rulemaking Requirements*, 82 NOTRE DAME L. REV. 1727, 1728 (2007). This is done by requiring agencies to issue public notices of proposed regulations, collect public comments, and take those comments into consideration when finalizing the regulation. *See Id.* at 1732-33.

The general procedures are as follows: 5 U.S.C. Section 553(b) requires an agency to publish in the *Federal Register* a public notice of its proposed rulemaking. *See  Id.* at 1733. Next, 5 U.S.C. Section 553(c) provides that the agency allow the public to submit comments on the proposed rule. *See Id*. Once the agency has collected the public's remarks regarding the proposed rule, it takes that input into consideration and only then writes out the rule. The agency will also include a concise general statement of the rule's basis and purpose, which the courts can use to review the validity of the rule. The rule is then published in the *Federal Register* again, and only after thirty days does it become a final rule, binding the courts and the public. Final rules may not be promulgated without first being publicly proposed. *See Id.* at 1732.

However, 5 U.S.C Section 553(b) provides exceptions to the notice-and-comment rulemaking requirements of 5 U.S.C. Section 553. These exceptions include interpretive rules, procedural rules, policy statements, and good cause. Such items are excluded from notice-and-comment rulemaking because they do not dictate the future conduct of individuals, nor do they have the effect of law. This is an extraordinary case that falls under a federal

question under the APA. In this case, the Plaintiffs entered into an IRS sponsored voluntary disclosure program and requested a reduced penalty through the IRS's so called "Transition Rules." As a federal agency, the IRS had an obligation to follow the rulemaking requirements of 5 U.S.C. Section 553 in regards to its "Transition Rules" and not impose undue hardship on the public by suddenly changing direction, to the detriment of those who relied on past policy." *See Anaheim v. FERC,* 723 F.2d 656, 659 (9th Cir.1984).

Starting in 2009, the IRS announced a series of offshore voluntary disclosure programs programs and initiatives to encourage individuals with unreported foreign financial accounts to enter into one of these programs. The IRS warned of "dire" consequences for applicants who did not make voluntary disclosures through a sponsored OVDP. *See* Statement from IRS Commissioner Doug Shulman of Offshore Income (Mar. 26, 2009), available at

https://www.irs.gov/uac/Statement-from-IRS-Commissioner-Doug-Shulman-on-Offshore-Income. Plaintiffs' counsel heard these announcements and advised the Plaintiffs to enroll into the 2014 OVDP. The 2014 OVDP required participants to pay a penalty equal to 27.5 percent of the highest aggregate balance of foreign accounts. About the same time, The IRS announced the Streamlined Filing Compliance Procedures. Individuals seeking to participate in the Streamlined Compliance Procedures were only required to pay an "offshore penalty" equal to five percent of the highest aggregate balance of foreign accounts not previously disclosed to the IRS. Following the announcement of the Streamlined Compliance Procedures, the IRS set forth "rules" for applicants who wanted to move from the OVDP to the Streamlined Procedures. The "Transition Rules" were set forth in the form of FAQs on the IRS website at:

http://www.irs.gov/Individual/International-Taxpayers/Transition-Rules-Frequently-Asked-Ques

tions-FAQs. The Transition Rules stated that certain applicants in the OVDP were provided with

the opportunity to remain in the OVDP while taking advantage of the favorable five percent

penalty. *See* Transition Rules FAQ, at No.1. At first the IRS stated that "a taxpayer who qualifies

for the [Streamlined Procedures] but who was already in the OVDP could withdraw from the

OVDP and move to the [Streamlined Procedures], but the IRS would appreciate receiving

correspondence from the taxpayer that details his intentions to do so." *See* Jaime Arora, *Don't*

*Hastily Join Streamlined Compliance Program, Keneally Say*s, Tax Notes, 74 Tax Notes Int'l

1206 (June 30, 2014) (quoting IRS official Jennifer Best). Later, the Transition Rules required

that any applicant who requested transition treatment to: 1) submit all documents required under

the iteration of the OVDP in which the applicant was participating; 2) submit a written statement

signed under penalty of perjury "certifying [his] non-willfulness with respect to all foreign

activities/assets, specifically describing the reasons for the failure to report all income, pay all

tax, and submit all required information returns, including FBARs, and, if the taxpayer relied on

a professional advisor, including the name, address, and telephone number of the advisor and a

summary of the advice; and 3) pay any tax, interest, and any accuracy-related, failure-to-file,

and/or failure-to-pay penalties that would be due under OVDP. *See* Transition Rules FAQs, at

No. 6.

The Transition Rules went on to say that the IRS will consider the applicant's request in

light of all the facts and circumstances of the applicant's case and will determine whether to

incorporate the five percent offshore penalty in the OVDP closing agreement. *See* Transition

Rules FAQs. at No. 7. The Transition Rules compelled IRS examiners to review whether the

applicant's certification of non-willfulness was complete and whether the available information

6

was consistent with the certification. The IRS examiner was required to make an initial

determination, and the examiner's manager and a technical advisor was required to concur with

that determination. A central review committee may also review the determination; the decision

of that committee was final. A participant had no ability to present their case to that committee.

*See* Transition Rules FAQs, at No. 8. The Transition Rules did not provide any guidance on the

criteria for whether an examiner's determination will be reviewed by the "Central Review

Committee," what the specific standards of the review were or any other relevant guidance.

Furthermore, the Transition Rules did not establish the burden of proof necessary to determine

willfulness or non-willfulness. Finally, the Transition Rules did not allow applicant's to appeal a

rejection of transition treatment. *See* Transition Rules FAQs, at No. 8. The Defendants

purposefully avoided the rulemaking procedures for the Transition Rules to diffuse it of any

accountability for its ever changing rules. The actions of the Defendants in promulgating the

Transition Rules were contrary to the notice and comment rulemaking requirements of 5 U.S.C.

Section 553 and without observance of procedure required by law under 5 U.S.C. Section

706(2)(D). Since the "Transition Rules" were not the product of notice and comment

rulemaking, they are arbitrary and capricious, and are therefore invalid.

**2. Plaintiffs' Attempt to Receive Transition Treatment in the OVDP**

     The Plaintiffs mistakenly believed that their UBS account was not reportable to the IRS.

The Plaintiffs took action to rectify their non-willful mistake and comply with the rules by

applying to the 2014 OVDP. The IRS assigned Revenue Officer Denise Soss to their case. The

Revenue Officer assigned to their case advised Plaintiffs that she believed they acted

non-willfully in failing to disclose their UBS account. The Revenue Officer recommended that

the Plaintiffs receive Transition Treatment and be assessed a reduced five percent penalty. The

Plaintiffs acted accordingly and requested in writing to transition from the 27.5 percent OVDP

penalty to the 5 percent Streamlined Procedures penalty. The Plaintiffs' case was ultimately

forwarded to the IRS's "Central Review Committee." Without providing the Plaintiffs any

reason, the "Central Review Committee" rejected the Plaintiffs' request for Transition

Treatment. When the Plaintiffs pressed the IRS for a reason why the "Central Review

Committee" believed the Plaintiffs willfully failed to disclose their UBS account, the IRS

threatened to remove the Plaintiffs from the OVDP and subject them to a full IRS examination.

The IRS's enacted Transitory Rules are arbitrary, capricious, an abuse of discretion, and

are not the product of notice-and-comment rulemaking. The ill-conceived Transition Rules

imposed upon the Plaintiffs a greater offshore penalty than they should have been assessed and

additional administrative disputes to resolve (thus increasing attorneys' fees). Nonetheless,

Defendants argue that-

> "Plaintiffs may avail themselves of a second alternative opportunity to pursue these
>
> Results. They can opt-out of the OVDP, allow the IRS to determine their liabilities by
>
> Examination, pay the assessed liabilities, and file an administrative claim for refund for
>
> The difference between the liability determined and the amount that would be due under
>
> The Streamlined [Domestic] Procedures; if that administrative refund claim is denied,
>
> They may then file a refund suit in federal court."

*See* Def Motion, pg. 14. This is an illusory alternative. No refund action could ever advance a

finding that the Defendants' "Transition Rules" are arbitrary and capricious and as a result

damaged the Plaintiffs. The Defendants' failure to follow the notice and comment requirements

is not an isolated oversight. Rather, it reflects the Defendants' pattern of ignoring the requirements of the notice and comment rules. *See* Tom Greenaway, *The IRS and the APA: Denial Is Not a Strategy*, Tax Notes, January 8, 2018, pg. 247.  Allowing the Defendants to avoid APA scrutiny would serve to reward the agency for so blatantly disregarding its procedural obligations of rulemaking.

**2. The "Central Review Committee" Violated the Due Process Rules**

Not only did the Transition Rules violate the rulemaking provisions of the APA, the IRS's "Central Review Committee" decision to deny the Plaintiffs transition treatment was arbitrary and capricious in that it violated the Plaintiffs' due process rights. According to the Defendants' FAQs, a "Central Review Committee" was established to review the eligibility of participants in the Streamlined Filing Procedures penalty structure. The Plaintiffs submitted a written request to the "Central Review Committee" to transition to the Streamlined Procedures. In order to participate in the Streamlined Procedures, the participant must certify to the IRS that he or she did not willfully fail to disclose a foreign financial account on an FBAR. The "Central Review Committee" determines whether a transition candidate acted willfully or non willfully in not disclosing a foreign financial account on an FBAR and a tax return. Without providing the Plaintiffs with any written or verbal grounds for denial, the "Central Review Committee" determined the Plaintiffs willfully omitted their UBS account. The "Central Review Committee's" denial of the Plaintiffs' request to transition to the five percent penalty was an informal agency action. 5 U.S.C. Section 555(e) states that "[p]rompt notice shall be given of the denial in whole or in part of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. except in

affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial." The underlying purpose of this section is to ensure the overall fairness of agency proceedings and to provide a basis for judicial review. *See Roelofs v. Secretary of Air Force*, 628 F.2d 594 (D.C.Cir.1980); *City of Gillette, Wyo. v. FERC*, 737 F.2d 883 (10th Cir.1984). Other purposes behind the section are to "keep the administrative agency within proper authority and discretion, avoid or prevent arbitrary, discriminatory, and irrational action by the agency, and inform the aggrieved person of the grounds of the administrative action so he can plan his course of action (including the seeking of judicial review)." *See Matlovich v. Secretary of Air Force,* 591 F.2d 852, 857 (D.C.Cir.1978).

The failure of Defendants' "Central Review Committee" to provide a brief statement of the grounds for denial for transition treatment was arbitrary and capricious agency action. Beyond the financial consequences of the "Central Review Committee's" determination, the Plaintiffs suffered the stigma of being labeled a willful tax cheat. The prospect of that designation is particularly painful to Plaintiffs, who find themselves in their present predicament only because they voluntarily reported their FBAR mistakes to the IRS and have tried to make amends. To be subject to the kinds of labels and penalties generally meted out to tax evaders and drug traffickers would inflict an injury that, although difficult to quantify, is nonetheless very real. *See Lexmark Int'l, Inc. v. Static Control Components, Inc*., 134 S.Ct. 1377, 1386 (2014). Yet, the Defendants still claim this suit should be resolved through refund litigation. Refund litigation applies only to the recovery of "any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully

collected under the internal-revenue laws;" *See* 28 U.S.C. Section 1346(a)(1). Refund litigation cannot fully consider antecedent steps taken against the Plaintiffs prior to rejecting their request from Transition Treatment, that the Defendants established a clandestine and secretive "Central Review Committee."

The Plaintiffs can only speculate whether the "Central Review Committee" considered any relevant factors in determining they did not qualify for transition treatment or even if such a committee existed. Since the Defendants have not provided the Plaintiffs with a reason as to why their request for Transition Treatment was rejected, the Plaintiffs were not able to consider all of their options how to best proceed. Through this APA action, this Court can order the Defendants to provide an explanation for the decision of its "Central Review Committee." Assuming the Defendants' "Central Review Committee" existed, such an order will allow the Plaintiffs to determine why the "Central Review Committee" determined they willfully failed to disclose their UBS account.

**B. The Closing Agreement Did Not Unambiguously Waive Plaintiffs' Right to Bring an APA Action Against the Defendants**

The Defendants compel all OVDP participants to execute a Form 906 upon completing the program.  By signing this closing agreement, [the participant] consents to the assessment and collection of the liabilities for tax, interest, additions to tax, and penalties determined by or resulting from the determination of this agreement, including any defenses based on the expiration of the period of limitations on assessment or collection. By executing the Form 906, a participant enters into a closing agreement with the IRS. A closing agreement is a written agreement between an individual and the Commissioner of the IRS which settles or "closes" the

liability of that individual with respect to any internal revenue liability covered under the OVDP. Closing agreements with the IRS are analyzed in a manner similar to contract law. Although closing agreements are governed by federal contract principles rather than state contract law, closing agreements under Internal Revenue Code Section 7121(a) "are contracts and generally are interpreted under ordinary contract principles."

It is well-established that "[a] party induced to enter a settlement agreement because of duress may be entitled to relief." *See Am. Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986). Specifically, "i[f] a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim." *See* Restatement (Second) of Contracts Section 175 (1981); *see also* 28 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts*, Section 71:8 (4th ed. 2000) ("[A] party coerced into a contract has a right to avoid or rescind the transaction"). Duress exists where: 1) one side involuntarily accepted the terms of another; 2) that circumstances permitted no other alternative; and 3) that said circumstances were the result of coercive acts of the possite party. *See Fruhauf Southwest Garment Co. v. United States*, 111 F.Supp. 945, 951 (Ct.Cl. 1953).

**1. As a Result of Defendants' Lack of Transparency, The Plaintiffs Involuntarily Accepted the Terms of the Closing Agreement**

The Defendants imply that this is a case in which the Plaintiffs made an informed decision to execute a closing agreement and now have "buyer's remorse." *See* Def Motion, pg 3. This is not a case of "buyer remorse." This is a case where the IRS pressured innocent violators into paying them far more in penalties than they should have owed under law.

The IRS is authorized to assess catastrophic penalties against anyone it determines to be a

willful violator of the FBAR rules. Under 31 U.S.C. Section 5321(a)(5)(C), the IRS can assess a maximum penalty for a willful FBAR violation up to half the value of the unreported accounts. Because the statute provides for a penalty for each year in which a taxpayer failed to file an FBAR, the IRS is permitted to seek- and has sought in the past- penalties *in excess* of the entire value of the account. *See* Charles Rettig, *Zwerner: Jury Determines 150% FBAR Penalty Applies- What Next?*, Forbes (May 29, 2014). Beyond the financial consequences is also the possibility of a criminal referral to the U.S. Attorney.

Determining whether an FBAR violation was willful is often difficult and depends on the subjective beliefs of the individual taxpayers for which there is often no direct evidence. In the absence of direct evidence, willfulness determinations are often based on an evaluation of circumstantial evidence. The Plaintiffs were not permitted to present any direct or indirect evidence to the "Central Review Committee" regarding their subjective beliefs or even communicate with the committee.

Without providing the Plaintiffs with any chance to present evidence, the "Central Review Committee" determined the Plaintiffs committed an willful FBAR violation. The determination of willfulness is critical to a taxpayer's assessment of how to navigate the IRS's complex system for resolving FBAR penalties. Knowing that the IRS's "Central Review Committee" had already determined the Plaintiffs acted willfully, the Plaintiffs had no choice but to sign the closing agreement. The alternative would be to face an examination with the prospect of devastating penalties by the same agency that already found the Plaintiffs willfully violated the law without considering any evidence. The IRS's complex and secretive process caused the Plaintiffs to sign the closing agreement under duress.

**2. The Circumstances of the OVDP Permitted the Plaintiffs With No Other Alternative But To Execute the Closing Agreement**

The circumstances of the Defendants' OVDP left the Plaintiffs with no other meaningful alternative but to execute the closing agreement. The Plaintiffs contacted the IRS Area Manager and requested an explanation as to why the "Central Review Committee" determined they willfully violated the law. The Plaintiffs' inquiry was met with threats and substantial pressure to sign the closing agreement. The Defendants accused the Plaintiffs of willful FBAR violations and refused to provide any explanation. Any attempt to question the process or the penalty was basically met with an answer of "if you don't agree to pay the 27.5 percent penalty, we'll take much more in an audit."  The Defendants' had no alternative but to sign the closing agreement.

The Defendants attempt to minimize the IRS's failed Transition Rules by stating- "even if an examination resulted in the IRS assessing willful FBAR penalties, [the] Plaintiffs would still have had the option of challenging those penalties in federal court." *See* Def Motion, pg. 14. The Plaintiffs should not have been forced into litigation with its own government to determine why one of its agencies determined they willfully violated the law.

**3. The Said Circumstances Were the Result of Coercive Acts of the Defendants**

The reason the Plaintiffs executed the closing agreement was because of the coercive acts of the IRS. Although the "Central Review Committee" violated 5 U.S.C. Section 555(e) of the APA, Territory Manager, Albert Ju had a chance to correct this very basic violation of agency law by either instructing the "Central Review Committee" to provide the Plaintiffs with a brief written statement of the grounds for denial of the transition treat or in the alternative Albert Ju could have provided the Plaintiffs a brief written statement for the denial. This way, the Plaintiffs

could have made an informed decision as to whether or not to execute the Form 906. Instead, Territory Manager Albert Ju threatened to remove the Plaintiffs from the OVDP and put the Plaintiffs through an examination which could have triggered willful civil and criminal FBAR penalties. In essence, the Defendants' strong armed tactics forced the Plaintiffs to execute the Form 906. The Plaintiffs expressed their frustration with the process by contacting the IRS on numerous occasions and ultimately attaching a supplement to the closing agreement. Rather than contacting the Plaintiffs and explaining the reason for the rejection of actions of the "Central Review Committee," the Defendants ignored the attachment. For the reasons discussed above, the Plaintiffs did not waive their right to challenge the tax and penalty assessments set forth in their Closing Agreement.

**4. The Closing Agreement Should Not Prevent the Plaintiffs From Proceeding With this Action**

Even if somehow the Defendants actions taken as a whole are determined not to be coercive, the execution of the Form 906 should not prevent the Plaintiffs from proceeding with this action. This is because the Plaintiffs are not contesting the taxes and penalties paid through the OVDP, which would otherwise be barred by the closing agreement. Rather, the Plaintiffs are challenging the OVDP process. Since the Plaintiffs are challenging the manner in which Defendants promulgated the rules governing the OVDP and the manner in which the Defendants assessed OVDP penalty, even if this Court does not set aside the closing agreement, the APA action should not be dismissed. Dismissing this action only encourages the Defendants to continue to violate the APA in the future.

**C. Plaintiffs Have Established a Waiver of Sovereign Immunity Because They Lack**

**Another Adequate Remedy Elsewhere**

The APA provides a waiver of sovereign immunity when two prerequisites are met. First, the action in question must "seek relief other than money and state a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." *See* 5 U.S.C. Section 702. Second, it must be demonstrated that 1) review of the agency action in question is authorized by a substantive statute or 2) review is made of a "final agency action for which there is no other adequate remedy in a court." *See* 5 U.S.C. Section 704. The Defendants assert that Plaintiffs have adequate remedies outside this instant case. In the Defendants' view, the Plaintiffs can file a refund suit under 28 U.S.C. Section 1346(a)(1).

The Defendants attempt to guard themselves from judicial review of their lack of transparency by claiming this is a suit about money. This is not merely a suit about money. Beyond the financial consequences of being wrongly assessed the 27.5 percent OVDP penalty and the damages the Plaintiffs' suffered as a result of the Defendants' failure to follow rulemaking, the Defendants' actions needlessly exposed the Plaintiffs to the increased costs and burdens of trying to find out why the Transition Committee determined they willfully failed to report their UBS account on an FBAR. This resulted in the Plaintiffs incurring additional attorney fees, costs, and expenses. The Plaintiffs cannot recover their attorneys' fees, costs, and expenses associated with representation through the Defendant's flawed OVDP through a traditional refund suit. The Plaintiffs can only pursue these claims in an APA action. Thus, this Court should not dismiss this APA suit.

**D.  The Determination of the Amount of Civil Penalty Each Participant Pays is a Final Agency Action**

The Defendants claim that the Transition Rules marked the "consummation" of the IRS's decision to establish procedures for triaging requests to settle Title 26 and Title 31 violations for less than the statutory maximum. *See* Def Motion, pg 22. The next issue in this case is whether the Transition Rules issued by the IRS is a "substantive rule" or a "general statement of policy." Under the APA, "[a] substantive rule constitutes a binding final agency action and is reviewable," whereas a general policy statement is not." *See Cohen v. United States*, 578 F.3d 1, 4 (D.C. Cir. 2009). Courts apply a two-prong test for determining whether a rule is binding and thus reviewable. That test looks at whether the rule "(1) marked the 'consummation' of the IRS's decision-making process and (2) either affects legal "rights or obligations" or results in 'legal consequences." *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

The Transition Rules are a 'consummation' of the IRS's decision making process because it is determining whether or not a foreign account holder acted "willfully" or "non willfully" for purposes of assessing a penalty through the OVDP. The legal "rights or obligations" are impacted. This is because the OVDP participants are assessed a penalty under Title 26 of the United States Code which they must satisfy in full.

In *Columbia Broadcasting System v. United States*, 316 U.S. 190, 63 S.Ct. 997 87 L.Ed. 1344 (1943), the Federal Communications Commission issued "an expression of the general statement expressed in the Commission's disfavor of certain contractual arrangements, pertaining to network programming, between local stations and the networks." The Columbia Broadcasting System, contending that this action was outside the Commission's statutory authority, sought review of it. Thus, there was nothing for a court to review. If a review should occur, such a review would be in the context of a license revocation, and that relief could then be

had on review of that revocation. The agency position, in short, was that their action was unreliable and it had no present legal effect. The Court took a more practical view of things and looked not to the "the substance of what the Commission had purported to do and has done." The substance was that the broadcast stations, rather than risking their licenses in renewal proceedings, would immediately give up the network contracts that the Federal Communications Commission had said it disfavored. The Commission action was, therefore, calculated to instill conformity, and it was, in its "practical operations, an order promulgating regulations which operate to control … contractual relationships." *See Columbia Broadcasting System,* 316 U.S. at 417.

As in *Columbia Broadcasting*, this Court should disregard the IRS's characterization of its action and instead look at the substance of what the IRS has purported to do and has done through its Transition Rules. The Transition Rules provide final decisions regarding FBAR penalties without the right of appeal. Thus, a final determination of a participant in the Transition Rules constitutes a "final agency action."

Though in a different context, in *PepsiCo, Inc. v. Federal Trade Commission*, 472 F.2d 179 (2d Cir.1972), cert. Denied 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973), the Federal Trade Commission had issued a complaint alleging that PepsiCo had "hindered..competition..by restricting its bottlers from selling outside of a designated geographic area." Before the Commission, PepsiCo moved that the complaint be dismissed because the Commission had failed to join the soft drink bottlers whose business relations with PepsiCo were affected by the complaint. When the Commission denied that motion, PepsiCo filed suit in federal district court, asking that the agency proceedings against it be enjoined unless the bottlers were joined as

parties. The district court dismissed the suit as "premature." The Second Circuit court of appeals, however, reversed the district court and held that the Commission's refusal to join the bottlers was presently reviewable. The Federal Trade Commission Act provided a special statutory form of review, but only when the Commission had issued a cease and desist order. Because no such order had been issued, review under the Federal Trade Commission Act was not an option. However, the court determined that judicial authority was more generally authorized by Section 704 of the APA. The court accepted the "principle that one can find 'final agency action for which there is no other adequate remedy in a court' if an agency refuses to dismiss a proceeding that is plainly beyond its jurisdiction as a matter of law or is being conducted in a manner that cannot result in a valid order." *See PepsiCo, Inc.,* 472 F.2d at 187. Although the Transition Rules do not bind the IRS to any particular course of action, as a practical effect these rules leave participants in limbo. Either accept the penalty assessed through the Transition Rules or risk an examination. Because the Transition Rules placed the Plaintiffs under a threat of penalties which cannot result in a valid order, this Court should find that judicial review is generally authorized by Section 704 of the APA.

**E. The Transition Rules Do Not Constitute a Presumptively Unreviewable Exercise of Enforcement Discretion**

The Defendants claim that the issuance of documents related to whether and how an agency intends to settle civil or criminal matters constitute agency "enforcement," rather than rulemaking. Administrative decisions generally involve discretion, and those actions are ordinarily reviewable. The APA follows this convention of reviewability. Respecting the "scope of review," the APA provides for judicial review of "abuse of discretion." *See* 5 U.S.C. Section

19

706. However, the APA's "committed to agency" exception to judicial review also establishes a "narrow" zone of discretion that is unreviewable. *See Id.* Enforcement actions are generally within this exclusion, because "a court would have no meaningful standard against which to judge the agency's exercise of discretion" in deciding how to enforce the statutory provisions. *See Hecker v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L. Ed. 2d 714 (1985). The Defendants tout *Chaney* and *Association of Irritated Residents, et al v. Environmental Protection Agency,* 494 F.3d 1027, 1034 (D.C. Cir. 2007) as authority to claim the Transition Rules are not subject to review. *Chaney* creates a presumption of reviewability of an agency's decision not to prosecute or enforce...is a decision generally committed to an agency's absolute discretion. *See Chaney* 470 U.S. at 831, 105 S. Ct. 1649. A sharply divided *Associated of Irritated Residents* court accepted the reasoning of *Chaney*. In *Chaney*, death row inmates challenged the refusal of the Food and Drug Administration ("FDA") to take various enforcement actions to prevent the use of lethal drugs for capital punishment. *See Chaney*, 470 U.S. at 823, 105 S. Ct. 1649. The inmates alleged that use of these drugs for execution violated the Food and Drug Act because the drugs had not been tested or approved for this purpose, they were likely to be administered by untrained personnel, and they were unlikely to induce quick and painless death as intended. the Court held that the FDA's decision not to bring an enforcement action against particular members of the regulated community was "committed to agency discretion by law" under 5 U.S.C. Section 701(a)(2) and therefore judicially unreviewable.

The Defendants claim that the Plaintiffs cannot prosecute an APA case because: 1) the Transition Rules are an "action committed to agency discretion" from judicial review; 2) whether and how to settle a tax claim is committed to the IRS' discretion; and 3) *Irritated Residents v.*

*E.P.A.* requires dismissal of the Plaintiffs' APA challenge.

**1. Courts Review Agency Actions to Assure the Agency Discretion is Rational**

The Defendants claim that APA waiver of sovereign immunity is not available for suits challenging "agency action...committed to agency discretion by law." Although Congress authorizes the IRS to enter into closing agreements and offers in compromises, there is no statute enacted by Congress authorizing the Transition Rules. Administrative decisions generally involve discretion, and those actions are ordinarily reviewable. Even in cases of open-ended statutes or the absence of a statute, agency discretion is not unlimited. Courts review agency actions in these situations to assure a degree of rationality by the agency. *See Merrill Ditch-Liners, Inc. v. Pablo,* 670 F.2d 139 (9th Cir.1982). Accordingly, even under wholly open-ended statutes the agency must operate according to "traditional standards of rationality and fair process," and these standards would be subject to APA review. *See Chaney*, 470 U.S. at 853.  The Defendants' lack of applied "traditional standards or rationality and fair process" injured the plaintiffs.

**2. The Defendants' Discretion to Settle Cases Through the Transition Rules is Reviewable by this Court**

In its Motion to Dismiss, the Defendant cites a number of statutes and regulations providing guidance which puts taxpayers on notice regarding closing agreements and offers to compromise tax liabilities. *See* Def Motion, pg. 25. In both these cases, the IRS provides the public with detailed instructions. For example, when attempting to compromise a tax liability, taxpayers are put on notice regarding the formalities of procedures. *See* www.irs.gov/individuals/article/0,,id=96543,00.htm. Other than ever changing FAQs, the IRS

provided the public with no true guidance for the Transition Rules.

The Defendants' claim in their motion that there are no "relevant statutes and regulations" by which a court could review the IRS's creation of the offshore settlement initiatives, or the publication of any particular procedures or instructions thereunder. *See* Def Motion, pg. 26. The Defendants go on to say that "these programs reflect the product of careful balancing of competing compliance priorities and limited resources that is not susceptible to judicial review." *See* Def Motion, pg. 26. In *Chaney* the Court explained that such a judicial limitation applies where there is "no meaningful standard against which to judge the agency's exercise of discretion." *See Chaney*, 470 U.S. at 830. There was no meaningful standard available in *Chaney*. The particular circumstances of that case were that inmates sentenced to death by an injection of lethal drugs claimed that the drugs were not in compliance with laws administered by the FDA and that the agency should therefore take various investigatory and enforcement actions. [3] That refusal was seen by the court as an instance of prosecutorial discretion unbounded by standards, and thus not susceptible to meaningful judicial review. None of the factors of *Chaney* are present in this case. *Chaney* death row inmates were concerned about a drug that will be ultimately used to execute them. This case on the other hand is about the IRS failing to follow even the most basic APA rules.

The opinion in *Chaney* was drawn from the "no law to apply" formula of the Court's earlier opinion in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). A citizen's group had challenged the Secretary of Transportation's decision to allocate federal funds for the construction of an interstate highway through a public park in

---

[3] The injury possibly caused by non-compliance with federal drug laws was a tortured rather than a quick and painless death.

Memphis. The Secretary, however, claimed that the decision was unreviewable as it had been committed to agency discretion. The Court disagreed. The agency discretion exception, the Court explained, is "very narrow," and only is "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *See Citizens to Preserve Overton Park*, 401 U.S. at 410. By statute, the Secretary's approval of funds was subject to the absence of "prudent and reasonable" alternative routes. Considering this "prudent alternative route" standard, the court held that the agency action was reviewable, according to whether the secretary's decision was based on the factors that Congress had made relevant to determining alternative routes. "Plainly" there was "law to apply," and thus the funding decision had not been "committed to agency discretion so as to be unreviewable." *See Citizens to preserve Overton Park,* 401 U.S. at 413.

The Defendants are correct in stating that there is no law to apply to the transition Rules. This is because the Transition Rules is the product of an agency that refused to comply with fundamental notice-and-comment rulemaking requirements and has disenfranchised the public from participating in the rulemaking process. Even if this was not the case, the IRS and its "Central Review Committee" are presumably applying portions of the Bank Secrecy Act and the Internal Revenue Code to determine if an OVDP participant qualifies for a reduced penalty under the Transition Rules. This means that there should be  relevant statutes and regulations to apply a "meaningful standard" to review the IRS's creation of its offshore settlement initiatives or "Transition Rules."

**3. The D.C. Circuit Decision in The Association of Irritated Residents v. E.P.A. Does Not Require Dismissal of Plaintiffs' APA Challenge**

The Defendants claim that the D.C. Circuit's decision in *Irritated Residents* makes it clear that the Plaintiffs cannot prevail on a facial challenge of the Transition Rules. *See Def Motion*, pg. 28. The Defendants are correct in that *Irritated Residents* arose from the EPA's publication of a settlement to resolve pork and poultry farm's past and ongoing violations of the Clean Air Act and other statutes in exchange for each participant's: 1) payment of a specified penalty based on the size of the farm; and 2) funding and participation in a study to develop new enforcement standards. Participation in the initiative was voluntary, however, and farms that chose not to sign a consent agreement remained subject to potential enforcement action by the EPA. The D.C. Circuit determined that the EPA's settlement initiative constituted a non-reviewable exercise of its enforcement authority, rather than rulemaking, and dismissed the case.

The Defendants claim that there is "no meaningful distinction between the offshore settlement initiatives at issue here (including the Transition Rules) and the settlement program at issue in *Irritated Residents*." *See* Def Motion, pg. 28. This is incorrect. In *Irritated Residents*, although the EPA settlement agreement did not comply with the notice and comment requirements of the APA, it crafted the settlement agreement in consultation with "representatives of state governments, environmental groups, local citizens' groups, and with the industries impacted". *See Irritated Residents*, 494 F.3d at 1029. The EPA also sought public comment. *See Irritated Residents,* 494. F.3d at 1038. After the comment period closed, the EPA concluded that the "vast majority" of the comments received "were ones that had been previously expressed to the EPA. *See Irritated Residents,* 494 F.3d at 1029. Although the EPA did not go through formal ruling making procedures in establishing its settlement program, the

EPA sought and considered public input.

In sharp contrast to the EPA's settlement program, the IRS never gave interested persons an opportunity to participate in the rulemaking with respect to the OVDP and Transition Rules through submission of written data, views, or arguments. The IRS published the Transition Rules solely through the Transition Rules FAQ on its website. The IRS knew that interested parties had criticized the absence of more formal guidance with respect to the OVDP and the Transition Rules  The Taxpayer Advocate Service, an independent office within the IRS, requested the IRS to improve the transparency of the OVDP and Transition Rules by publishing guidance that incorporated comments from the public, by formally disclosing and/or publishing interpretations of guidance, and by incorporating IRS personnel instructions into the Internal Revenue Manual. *See* National Taxpayer Advocate, *Objectives Report to Congress, IRS Responses and National Taxpayer Advocate's Comments Regarding Most Serious Problems Identified in the 2014 Annual Report to Congress*, Vol. 2, at 28 (2016) (describing Most Serious Problem #7, "Offshore Voluntary Disclosure (OVD): The OVD Programs Initially Undermined the Law and Still Violate Taxpayer Rights"). The IRS ignored this report and to date has not published any specific comments or feedback that it has considered in promulgating guidance for the Transition Rules. Instead, the IRS determined that a secretive process served it well. Uncertainty in Transition Rules caused individuals such as the Plaintiffs to suffer anxiety or worry over the prospect of wrongly being assessed draconian penalties. This uncertainty pressures innocent violators into agreeing to pay the IRS far more in penalties that they would under the law. *See Taxpayer Advocate Report*, supra, at 164, 171.

Simply put, the Defendants cannot compare the EPA's settlement program which was the

product of consultations with the general public to IRS's Transition Rules that were established in secrecy and executed by a clandestine committee.  The holding in *Irritated Residents* is easily distinguishable from the facts in this case.

**F. Plaintiffs State a Claim for Relief Under the Fifth Amendment**

The Defendants claim that the Transition Rules fail to create any property rights in favor of the Plaintiffs. *See* Def Motion, pg. 30. The Defendants' position misses the point. To establish procedural standing, plaintiffs must be seeking to enforce a procedural requirement in which the disregard could impair a separate concrete interest of theirs. "A violation of the procedural requirement of a statute is sufficient to grant a plaintiff standing to sue, so long as the procedural requirement was designed to protect some threatened concrete interest of the plaintiff." *See City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003). They must also establish two links of causation: 1) connecting the omitted procedure of some substantive government decision that may have been wrongly decided because of the lack of the procedure, and 2) connecting that substantive decision to the plaintiff's particularized injury. *See Defenders of Wildlife v. Perciasepe*, 714 F.3d 1317, 1312 (D.C. Cir. 2013).

The Plaintiffs suffered an injury because the IRS arbitrarily and capriciously determined they willfully omitted a UBS account from their tax returns. This resulted in the Plaintiffs having been labeled as willful tax cheats, paying lawyer fees to defend themselves from the Defendant, and needlessly being assessed a large penalty through the OVDP.

Perhaps the most significant due process deficiency in this case was the lack of fairness. Fairness refers to agency action according to known standards that are impartially applied through revealed procedures. Known *standards* allow a person to better understand what the

government expects of her, so that she can plan her life in some forehanded way.  Known standards also limit the allocation choices of agency officials. They require that choices be made according to principle rather than the preference of the official. Revealed *procedures*- procedures seen and comprehended- are essential to an individual's effective and comfortable participation in the agency's application of its standards to her. *See Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. 1, 13-15 (1978).

In *Board of Regents v. Roth,* 408 U.S. 564 (1972), the Court emphasized that due process was "a safeguard of security of interests that a person has … in specific benefits. *See Board of Regents*, 408 U.S. at 576. This goal of security, at least in relation to what process is due has been treated as the composite of fairness and accuracy. If the law applying processes of agencies are accurate and fair, then the interest in security as described in *Roth* has been served. *See Dixon v. Love*, 431 U.S. 105, 114 (1977).

The due process provided to the Plaintiffs through the Transition Rules can hardly be called fair. The Transition Rules did not provide any guidance on the criteria as to the factors the "Central Review Committee" will consider during its review. The Transition Rules also did not describe the burden of proof necessary to determine willfulness. Finally, the Transition Rules did not allow applicants to appeal the IRS's determination of whether the applicant qualifies for transition treatment. *See* Transition Rules FAQs, at No.8. The Transition Rules provided no known rules to determine if its process was fair. In addition,  The "Central Review Committee" did not even provide the Plaintiffs with a bare-bones written decision that explained its basis for its decision. The IRS failed to provide the Plaintiffs with minimal procedural due process protections. Accordingly, the Plaintiffs established a due process claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs urge the court to deny Defendant's motion to dismiss.

Dated: August 18, 2020                    Respectfully submitted,


_/s/ Anthony V. Diosdi_
Anthony V. Diosdi
Diosdi Ching & Liu, LLP
505 Montgomery Street
San Francisco, CA 9411
415-318-3990

adiosdi@sftaxcounsel.com

28