**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ROBERT HARRISON and JULIANNE SPRINKLE**, <br><br> Plaintiffs, <br><br> v. <br><br> **INTERNAL REVENUE SERVICE,** <br><br> **CHARLES RETTIG,** in his official capacity as Commissioner of Internal Revenue**,** <br><br> **UNITED STATES DEPARTMENT OF THE TREASURY,** <br><br> **JANET L. YELLEN,** in her official capacity as United States Secretary of the Treasury, <br><br> **UNITED STATES OF AMERICA**, <br><br> Defendants. | Case No. 20-cv-828 (CRC) |

<u>**MEMORANDUM OPINION**</u>

U.S. taxpayers who hold foreign bank accounts must report them on their tax returns. Failure to do so can result in civil penalties and even criminal prosecution if the concealment was intentional.  To encourage reporting, the Internal Revenue Service has previously allowed qualified taxpayers to reduce their legal and monetary exposure by voluntarily disclosing previously-unreported offshore accounts and entering a settlement agreement with the agency.

In 2018, plaintiffs Robert Harrison and Julianne Sprinkle took advantage of one of two IRS voluntary-disclosure programs for holders of offshore accounts.  They fessed up to having maintained an unreported Swiss bank account for roughly a decade, paid back-taxes along with a

lower (though still substantial) penalty, and executed a settlement agreement with the IRS in which they gave up the right to seek a refund of the penalty payment in the future.

Two years later, however, the couple apparently had a change of heart.  They filed this lawsuit to nullify the settlement agreement and recoup the penalty, claiming that they settled under duress.  They also challenge the process by which the IRS denied their request to participate in the alternative (and more lenient) voluntary disclosure program.  The IRS has moved to dismiss the couple's amended complaint.  Finding that Harrison and Sprinkle have not plausibly alleged duress and that their procedural objections can be pursued only through a tax refund suit, which they waived as part of the settlement, the Court will grant the motion.

## I.   Background

### A.   The IRS's treatment of undisclosed offshore accounts

Detecting tax code violations takes time and costs money.  Like any agency operating under budget constraints, the IRS must cope with the reality that it cannot investigate every potential instance of potential tax evasion.  In the normal course, the agency must rely on the risk of civil and criminal penalties—and a large measure of good faith—to maintain public compliance with the tax code.  See United States v. Bisceglia, 420 U.S. 141, 145 (1975).  In the mid-2000s, one area of tax evasion which bedeviled the IRS concerned unreported income and assets held abroad.  The obligation to report these holdings arises in part from the Bank Secrecy Act of 1970, which requires the Secretary of the Treasury to issue rules requiring individuals to file annual reports identifying selected relationships with foreign financial institutions.  See 31 U.S.C. §§ 5314(a), 5321(a)(5).  The regulations implementing this dictate require certain U.S. taxpayers to file an annual "Foreign Bank Account Report" ("FBAR") for accounts with foreign institutions that exceeded $10,000 in the prior calendar year.  See 31 C.F.R. §§ 1010.350,

1010.306(c).  Penalties for failing to file FBARs can be severe.  <u>See</u> <u>id.</u> § 1010.810(g).  Willful failure subjects the taxpayer to potential criminal prosecution resulting in up to five years in prison.  <u>See</u> 31 U.S.C. § 5322.  On the civil side, maximum penalties for a willful violation are the greater of $100,000 or 50% of the balance in the unreported foreign account, while non-willful penalties are capped at $10,000 per violation and may even drop to zero if the taxpayer can establish "reasonable cause" for any FBAR violation and accurately reported the amount in the account.  <u>See</u> <u>id.</u> §§ 5321(a)(5)(B), 5321(a)(5)(C)(i).

In 2009, the IRS promulgated a set of rules to encourage individuals to disclose previously unreported foreign investment income on their tax returns.  <u>See</u> <u>Dewees v. United States</u>, 272 F. Supp. 3d 96, 98–99 (D.D.C. 2017) (Cooper, J.), <u>aff'd</u>, 767 F. App'x 4 (D.C. Cir. 2019).  This program—the "Offshore Voluntary Disclosure Program" or "OVDP"—promised lower penalties for taxpayers who came clean.  <u>See</u> <u>id.</u>; First Am. Compl. ("FAC") at ¶6.  Specifically, the IRS would limit the number of tax years considered in calculating any non-compliance penalty and consolidate the penalties for non-compliance into a single payment known as a "miscellaneous offshore penalty" ("MOP").  <u>See</u> <u>Maze v. Internal Revenue Serv.</u>, 206 F. Supp. 3d 1, 6 (D.D.C. 2016), <u>aff'd</u>, 862 F.3d 1087 (D.C. Cir. 2017); FAC at ¶38.  This single payment represented a percentage of the highest aggregate balance of the account in question and, at all times relevant here, was set at 27.5 percent.  FAC at ¶¶6, 38.  As a further benefit to induce participation in the OVDP, the IRS would recommend against criminal prosecution and execute a settlement agreement—referred to as a "closing agreement" or "Form 906"—with the participants.  <u>Id.</u> at ¶¶7, 32.  In these closing agreements, the IRS would state that the payment of back taxes and penalties under the OVDP resolved the participants' tax liability.  <u>Id.</u> at ¶¶32–33.  To participate in the OVDP, a taxpayer was required to, among other

things, file eight years of tax returns and FBARs, and pay the tax and interest due on any

undisclosed accounts, along with associated accuracy-related penalties, for the same time period.

Id. at ¶6.

The OVDP began in 2009 and was phased out in 2018.  See I.R.S. News Release IR-

2018-52 (March 13, 2018).  In mid-2014, the IRS inaugurated another program—the

"Streamlined Domestic Procedures"—for individuals with unreported foreign accounts who

were not currently participating in the OVDP and who certified that their failure to previously

report their accounts was "non-willful."[1]  FAC at ¶9.  Taxpayers who submitted the required

certification only had to pay a flat 5% MOP.  Id.  However, this lower rate came with the caveat

that taxpayers taking advantage of the Streamlined Procedures would still be subject to a risk of

audit under the IRS's usual audit programs, along with the prospect of higher penalties and

potential criminal prosecution if, following the audit, the IRS disagreed with the "non-willful"

self-certification.  See Dewees, 272 F. Supp. 3d at 99; FAC at ¶¶8–9.

Anticipating demands by current OVDP participants who had not yet executed a closing

agreement to switch to the Streamlined Procedures' lower-penalty regime, the IRS issued a set of

"Transition Rules" which enabled individuals who were enrolled in the OVDP to be treated

under the Streamlined Procedures.  FAC at ¶¶42–43.  The Transition Rules, which were outlined

in a "FAQ" on the IRS's website, required taxpayers seeking transitional treatment to submit a

sworn statement certifying that their failure to file FBAR reports was "non-willful[]."  Id. at ¶45.

To grant transitional treatment, the IRS had to "agree that the available information is consistent

---

[1] The plaintiffs refer to this program as "Streamlined Compliance Procedures" in their
complaint, see, e.g., FAC at ¶10, while the IRS uses "Streamlined Domestic Procedures," Mot.
to Dismiss at 9.  The Court opts for "Streamlined Procedures" for simplicity.

with the taxpayer's certification of non-willful conduct." IRS, Transition Rules: Frequently Asked Questions (FAQs), FAQ #7, https://www.irs.gov/individuals/international-taxpayers/transition-rules-frequently-asked-questions-faqs (last updated March 4, 2020). Eligibility determinations were made in the first instance by an IRS examiner, along with the examiner's manager and a technical advisor. Id. at FAQ #8. These decisions were subject to review by a "Central Review Committee" whose determination was final. Id. In the event the IRS rejected the request for transitional treatment, the taxpayer could still choose to have their case resolved through either the OVDP or a typical examination process, during which the taxpayer could seek to establish non-willfulness. Id.; see also Maze, 206 F. Supp. 3d at 20.

B. The plaintiffs' participation in the OVDP

Enter the plaintiffs: Robert Harrison and Julianne Sprinkle, a married couple. FAC at ¶58. In the early 2000s, while living abroad, the couple placed approximately $850,000 in a Swiss bank account but failed to report the account or the associated income for more approximately a decade. Id. at ¶¶62–64; Mot. to Dismiss Ex. A at 5.[2] After returning the U.S. in early 2014, they entered into the OVDP program and disclosed the account, which had reached a

---

[2] While primarily restricted to the pleadings when deciding a motion to dismiss, a court may consider "documents attached as exhibits or incorporated by reference in the complaint." Hinton v. Corr. Corp. of Am., 624 F. Supp. 2d 45, 46 (D.D.C. 2009) (internal quotation marks omitted); see also Marshall v. Honeywell Technology Solutions, Inc., 536 F. Supp. 2d 59, 65 (D.D.C. 2008) ("[W]here a document is referred to in the complaint and is central to the plaintiff's claim, such a document attached to the motion papers may be considered without converting the motion [to dismiss] to one for summary judgment.") (internal quotation and citation omitted). The Closing Agreement and correspondence between the IRS and the plaintiffs are expressly referenced in the plaintiffs' compliant and are central to their claim. See, e.g., FAC at ¶¶66–70, 94–96. The IRS attached the agreement and correspondence to its motion and plaintiffs presented no objection to their validity or completeness. See Mot. to Dismiss Ex. A–E. As such, the Court will consider both in deciding the motion. See Hinton, 624 F. Supp. 2d at 46–47.

peak value of approximately $1.2 million in 2007.  Id. at ¶¶62–64; see Mot. to Dismiss Ex. A at 7.  But when the Streamlined Procedures were announced shortly thereafter, the couple sought to transition to the Streamlined Procedures' more favorable penalty structure under the Transition Rules.  FAC at ¶65.  They submitted the required self-certification of non-willfulness and were informed by an IRS officer that they qualified for the lower penalties under the Transition Rules. Id. at ¶¶64–65.  However, in 2017, the officer informed the couple that the Central Review Committee had denied their request for transitional treatment.  Id. at ¶¶66–67; .

In August 2017, following the denial by the Central Review Committee, the IRS informed Harrison and Sprinkle that they would need to choose whether to remain in the OVDP and execute a closing agreement, or proceed to an examination (i.e., an audit) under the IRS's traditional procedures.  Id. at ¶68; Mot. to Dismiss Ex. C at 1–2.  The IRS conveyed the same message in a February 2018 follow-up letter.  FAC at ¶69; Mot. to Dismiss Ex. D at 1.  An IRS Territory Manager reiterated the point in April 2018 after the couple requested further review of their case.  FAC at ¶70; Mot. to Dismiss Ex. E. at 1–3.  Harrison and Sprinkle ultimately decided against going through the typical examination process because they believed that "they would face such extreme penalties that they would lose all their financial assets."  FAC at ¶71.  They instead executed the Closing Agreement in April 2018 and paid $510,943.44—representing the 27.5% MOP plus the back taxes, interest, and other penalties owed—pursuant to the terms of the OVDP program.  Id. at ¶¶73–74.  As relevant here, the Closing Agreement provided that the "[t]axpayers agree not to file a refund claim for the underlying tax, penalties, and interest for any amount that relates to the underreported income described in this closing agreement, for any years subject to this closing agreement, on any grounds."  Mot. to Dismiss Ex. A at 3.

Approximately two years after Harrison and Sprinkle executed the Closing Agreement, they brought this suit against the IRS, the Treasury Department, their respective heads, and the United States.  Their amended complaint asserts four claims:  *first*, that the Transition Rules were promulgated without notice and comment rulemaking in violation of Section 706(2)(D) of the Administrative Procedure Act ("APA"); *second*, that the application of the Transition Rules here was "arbitrary, capricious, an abuse of discretion, and otherwise contrary to law" under APA Section 706(2)(A); *third*, that the purported absence of various procedural protections in the Transition Rules violates the Due Process Clause of the Fifth Amendment; and *fourth*, that the Closing Agreement is invalid because the couple executed it under duress.  The government has moved to dismiss the amended complaint in its entirety.

## II.   Legal Standards[3]

When analyzing a motion to dismiss under Rule 12(b)(6), courts determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  When analyzing a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the Court "assume[s] the truth of all material factual allegations in the complaint, and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'"  Am. Nat'l Ins. Co. v. FDIC, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting Thomas v. Principi, 394

_____

[3] While the government only sets forth the standards for dismissal under Federal Rule of Civil Procedure 12(b)(6) in its motion, it notes that the plaintiffs' APA claims should be dismissed for both lack of jurisdiction and failure to state a claim.  See Mot. to Dismiss at 3.  As explained below, the Court will analyze the APA claims for lack of subject matter jurisdiction under Rule 12(b)(1) and the other claims under Rule 12(b)(6).

F.3d 970, 972 (D.C. Cir. 2005)).  Under Rule 12(b)(1), the plaintiff bears the burden of

establishing jurisdiction by a preponderance of the evidence.  See Lujan v. Defs. of Wildlife, 504

U.S. 555, 561 (1992).

### III.   Analysis

The Court will tackle the plaintiffs' APA claims before moving to their due process

challenge and, finally, their effort to rescind the Closing Agreement.  As explained below, all of

the claims are subject to dismissal.

### A.   APA claims

Again, Counts I and II of the amended complaint assert that the IRS violated the APA by

not subjecting the Transition Rules to notice and comment rulemaking and by applying them to

the plaintiffs in a manner that was arbitrary and capricious.  FAC at ¶13.  The government moves

to dismiss on three separate grounds.  It argues primarily that plaintiffs cannot maintain an action

under the APA because a tax refund suit provides an adequate alternative remedy.  Alternatively,

the government contends that the Transition Rules are not "final agency action" under the APA

and constitute an unreviewable exercise of the IRS's enforcement discretion.  Agreeing with the

agency's primary point, the Court need not reach its other contentions.

The APA "supports a cause of action only when 'there is no other adequate remedy in a

court.'"  Starr Int'l Co., Inc. v. United States, 910 F.3d 527, 536 (D.C. Cir. 2018) (quoting 5

U.S.C. § 704).  Section 704's "adequate remedy bar" thus determines whether plaintiffs have a

cause of action under the APA for vindication of their alleged injury, or if they are required to

bring a suit under a different statute.  See id. (citing Perry Capital LLC v. Mnuchin, 864 F.3d

591, 620–21 (D.C. Cir. 2017)).  The bar precludes an APA suit where "Congress has provided

special and adequate review procedures."  Bowen v. Massachusetts, 487 U.S. 879, 903 (1988).

In considering the "availability and adequacy of alternative remedies," courts must "give the APA a hospitable interpretation such that only upon a showing of clear and convincing evidence of a contrary legislative intent" should courts find APA review unavailable.  Garcia v. Vilsack, 563 F.3d 519, 523 (D.C. Cir. 2009) (internal quotation marks omitted).  To qualify as "adequate," the "alternative remedy need not provide relief identical to relief under the APA." Id. at 522.  Instead, relief of the "same genre" will typically be "sufficient to preclude the APA remedy."  Women's Equity Action League v. Cavazos, 906 F.2d 742, 751 (D.C. Cir. 1990). "[R]elief will be deemed adequate where a statute affords an opportunity for de novo district-court review" of the agency action.  Garcia, 563 F.3d at 522–23 (internal quotation marks omitted).

There can be no serious question that a tax refund suit is an adequate alternative remedy for the plaintiffs' claims here.  The refund statute, 26 U.S.C. § 7422(a), provides that "[n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority . . . until a claim for refund or credit has been duly filed with" the IRS.  This provision thus "provides a cause of action for the 'recovery'" of taxes alleged to have been illegally or improperly collected and, in doing so, displaces a cause of action under the APA.  Starr Int'l Co., Inc., 910 F.3d at 536 (quoting 26 U.S.C. § 7422(a)).  A taxpayer may bring a refund action "either in United States district court or in the United States Court of Federal Claims," but only after complying with the "tax refund scheme established in the Code," including filing such a claim with the IRS.  United States v. Clintwood Elkhorn Min. Co., 553 U.S. 1, 4 (2008) (citing 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a)).  Taxpayers

are thus "generally required to challenge the validity of a tax assessment in a refund proceeding as opposed to suits seeking equitable or declaratory relief."  Starr Int'l Co., Inc., 910 F.3d at 536.

The plaintiffs' suit, though occasionally styled as a suit for "declaratory relief," principally seeks the "refund" of the "all money that [p]laintiffs paid to [d]efendant through their participation in the OVDP's penalty structure" and an order that "[p]laintiffs may transition into the 2014 Streamlined Procedures five percent penalty."  FAC at 19–20.  The express purpose of the suit, then, is the recovery of money paid as penalties for violations of the tax code—in other words, a "refund."  See 26 U.S.C. § 7422(a) (describing a refund suit as a suit for "recovery of any . . . tax . . . or of any penalty" which plaintiffs allege was improperly collected); 28 U.S.C. § 1346(a)(1) ("[t]he district courts shall have original jurisdiction . . . of . . . any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws.").  As a fellow court in this district put it:  "[t]he question is the adequacy of remedy, and Plaintiff's claims against Treasury Defendants—no matter how styled—always come back to taxes.  This action is a refund suit in everything but name."  Clark Cty. Bancorporation v. United States Dep't of Treasury, No. CV 13-632, 2014 WL 5140004, at *9 (D.D.C. Sept. 19, 2014).  So too here:  a tax refund suit provided Harrison and Sprinkle with an adequate alternative remedy to recover the taxes and penalties they paid.[4]  As

---

[4] As the government notes, the fact that Harrison and Sprinkle relinquished their right to file a refund suit by entering the Closing Agreement does not affect whether "no other remedy exists" for purposes of Section 704.  Parties cannot waive their way into federal jurisdiction where Congress has not granted it.  See, e.g., Dailey v. Park, 468 F. Supp. 2d 209, 214 (D.D.C. 2007) ("cases are legion holding that a party may not waive a defect in subject-matter

result, their APA claims fall outside the government's waiver of sovereign immunity and must be dismissed for lack of subject matter jurisdiction.  See Cause of Action Inst. v. Eggleston, 224 F. Supp. 3d 63, 74–75 (D.D.C. 2016) (noting that the APA's waiver of sovereign immunity will not apply where an "adequate alternative remedy" is available and thus that "dismissal for lack of subject matter jurisdiction is required" in such cases (citation omitted)).

In any event, the D.C. Circuit has specifically held that a refund suit provides an adequate alternative remedy for taxpayers challenging the IRS's denial of their request to transition from the OVDP to the Streamlined Procedures.  Maze v. Internal Revenue Service, 862 F.3d 1087, 1093 (D.C. Cir. 2017).  Quoting from the district court's decision, the Circuit described precisely what the plaintiffs could have done to vindicate their rights:

> [O]pt-out of the OVDP, allow the IRS to determine their liabilities by examination, pay the assessed liabilities, and file an administrative claim for a refund for the difference between the liability determined and the amount that would be due under the Streamlined Procedures; if that administrative refund claim is denied, they may then file a refund suit in federal court.

Id. at 1093.  As noted, the same remedial course of action was available to Harrison and Sprinkle.

It does not matter that the couple also seeks to set aside the Transition Rules as unlawful. See FAC at 19–20.  The plaintiffs in Maze sought identical relief under the APA, but the Circuit rejected the suggestion that they could not challenge the legality of the rules in a refund suit. Maze, 862 F.3d at 1093 n.6.  ("The plaintiffs worry that, in a refund suit, they could challenge only the amount of their tax liability, not the Transition Rules themselves . . . We disagree[.]").  The court added that the IRS had acknowledged that the "plaintiffs may indeed challenge the

---

jurisdiction or invoke federal jurisdiction simply by consent." (quotation marks and citation omitted)).

Transition Rules in a refund action," id., which the agency has done here as well, see Def.'s Reply at 12.  Maze therefore requires dismissal of the plaintiffs' APA claims.[5]

B. Due Process claim

In Court III of the amended complaint, Harrison and Sprinkle generally allege that the same purported lack of standards and procedural safeguards that render the Transition Rules arbitrary and capricious under the APA also violate the Due Process Clause of the Fifth Amendment.  FAC at ¶¶87–93.  The government responds that the plaintiffs have failed to state a claim because (1) they have not alleged that they were deprived of any constitutionally-protected property interest, and (2) the agency provided sufficient procedural rights to taxpayers, like the plaintiffs, who participated in the OVDP but were denied transitional treatment.  The court readily agrees with the government's second argument so need not reach the first.

The Due Process Clause "does not exist to provide process as an end unto itself; it exists to provide adequate process where [the] government threatens a judicially cognizable interest in life, liberty, or property."  Marciano v. Shulman, 795 F. Supp. 2d 35, 41 (D.D.C. 2011).  "The

_____

[5] The Circuit in Maze upheld the dismissal of the plaintiffs' APA claims for lack of subject matter jurisdiction on the ground that the claims were barred under Anti-Injunction Act, which prohibits federal courts from hearing "'suits seeking to restrain the assessment or collection of taxes.'"  862 F.3d at 1091 (quoting Cohen v. United States, 650 F.3d 717, 724, 727 (D.C. Cir. 2011) (en banc)).  The government does not invoke the Anti-Injunction Act here, presumably because, unlike the plaintiffs in Maze, Harrison and Sprinkle are attempting to recoup taxes and penalties they have already paid.  Compare id. at 1090–91 with FAC at 19–20. Still, the Circuit's conclusion in Maze that a refund suit provided an adequate alternative remedy is integral to its holding.  That is so because that finding was necessary in reaching the ultimate question of whether the Anti-Injunction Act stripped the district court of jurisdiction.  See Maze, 862 F.3d at 1093 (noting that the AIA does not bar suit where there is no other remedy for the injury and finding that the AIA barred plaintiffs suit because a refund suit provides an adequate remedy); see also Citizens for Responsibility and Ethics in Washington v. United States Dep't of Justice, 846 F.3d 1235, 1244 (D.C. Cir. 2017) ("we are bound 'not only [by] the result' of a prior opinion 'but also [by] those portions of the opinion necessary to that result.'" (alterations original) (quoting Seminole Tribe of Florida v. Florida, 517 U.S. 44, 67 (1996)).

fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).  Courts judge procedural due process challenges to property deprivations by weighing (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  Id. at 335.  However, "the Supreme Court has consistently held that, where internal revenue collection is at issue, the availability of a meaningful post-deprivation remedy is sufficient to satisfy the Due Process Clause."  Hefti v. Knapp, 46 F.3d 1133 (7th Cir. 1995) (citing McKesson Corp. v. Division of Alcoholic Beverages and Tobacco, 496 U.S. 18, 51 (1990), Bob Jones Univ. v. Simon, 416 U.S. 725, 746–48 (1974), Fuentes v. Shevin, 407 U.S. 67, 90–92 (1972) and Phillips v. Comm'r of Internal Revenue, 283 U.S. 589, 595–97 (1931)).

That principle applies here.  To recap: when Harrison and Sprinkle requested to transition to the Streamlined Procedures' penalty structure, they were required to certify that their FBAR violations were not willful.  See FAC at ¶9.  The IRS rejected the couple's certification.  At that point, they acknowledge that they had two options: either accept the penalty structure imposed by the OVDP and execute a closing agreement waiving their right to further contest these penalties, or proceed through the typical procedures offered to all taxpayers under IRS investigation.  See id. at ¶¶68–70.  Those procedures—an examination and, if unsatisfactory, the filing of a refund suit in a district court or the Court of Federal Claims, 26 U.S.C. § 7422(a), 28 U.S.C. § 1346(a)(1)—risked higher civil and criminal penalties than the OVDP program, but

also held out a possibility of lower penalties than even those offered under the Streamlined Procedures.  See 31 U.S.C. §§ 5321(a)(5)(B), 5321(a)(5)(C)(i), 5322.  The IRS's rejection of the plaintiffs' certification no way closed off these procedures or the prospect of eventual judicial review of the agency's determination should the couple have opted against executing a closing agreement.  As the Supreme Court has stated, mere postponement of an opportunity to challenge the imposition of a tax penalty "is not a denial of due process, if the opportunity given for the ultimate judicial determination of the liability is adequate."  Phillips, 283 U.S. at 596–97.  Such delays are "an inevitable consequence" of disputes between taxpayers and the IRS and are not unconstitutional.  Bob Jones Univ., 416 U.S. at 747.  Harrison and Sprinkle chose to settle their issues with the IRS rather than go through the process of examination and judicial review; this simply does not amount to a due process violation.  See Dewees v. United States, 272 F. Supp. 3d 96, 101–02 (D.D.C. 2017) (Cooper, J.), aff'd, 767 F. App'x 4 (D.C. Cir. 2019).

The Court will, accordingly, grant the government's motion to dismiss Count III for failure to state a claim.

### C.  Validity of the Closing Agreement

As explained above, Harrison and Sprinkle must pursue their requested relief, if at all, through a refund suit under 26 U.S.C. § 7422(a).  See supra III.A.  But by executing the Closing Agreement, they expressly "agree[d] not to file a refund claim for the underlying tax, penalties, and interest . . . on any grounds."  Mot. to Dismiss Ex. A at 3.  Seeking to extricate themselves from this obvious waiver, the couple asks the Court in Count IV of the amended complaint to find the closing agreement "invalid" due to duress.  See FAC at 19.  The Court declines.

"'[A] party induced to enter a settlement agreement because of duress may be entitled to relief.'"  Wright v. Foreign Serv. Grievance Bd., 503 F. Supp. 2d 163, 174 (D.D.C. 2007), aff'd,

No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008) (quoting <u>Am. Sec. Vanlines, Inc. v.</u> <u>Gallagher</u>, 782 F.2d 1056, 1060 (D.C.Cir.1986)).  Closing agreements with the IRS are creatures of federal law and, as such, are interpreted according to "federal common law contract principles," rather than the contract law of any particular state.  <u>U.S. v. National Steel Corp.</u>, 75 F.3d 1146, 1150 (7th Cir. 1996).  Courts in this district and elsewhere have applied the Second Restatement of Contracts when considering duress claims for contracts analyzed under federal common law.  <u>See</u> <u>Wright</u>, 503 F. Supp. 2d at 174; <u>see also, e.g.,</u> <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1481–82 (6th Cir. 1989).

The relevant provision of the Restatement is Section 175(1), which provides that "[i]f a party's manifestation of assent is induced by an improper threat by the other party that leaves the victim no reasonable alternative, the contract is voidable by the victim."  Restatement (Second) of Contracts § 175(1).  Harrison and Sprinkle offer no plausible allegations of threats made by the IRS, let alone ones that left them with no reasonable alternative but to enter into the Closing Agreement.  They do not allege that any IRS official indicated that the agency would take a particular action, or effect a particular outcome, if they chose not to settle.  Nor does the correspondence from the agency referenced in the amended complaint contain any such threats.[6] Rather, the couple argues that their execution of the Closing Agreement was the improper product of duress because the "alternative [to signing] would be to face an examination with the prospect of devastating penalties by the same agency that already found [that they] willfully violated the law."  Pls.'s Resp. at 13.  This argument is untenable.

---

[6] Again, the Court may consider documents referenced in a complaint in deciding a motion to dismiss under Rule 12(b)(6).  <u>See</u> <u>supra</u> note 2.

To begin with, the fact that the IRS informed the couple (and their lawyer) that they risked substantial penalties if they did not sign the Closing Agreement is plainly insufficient for a claim of duress.  See Mot. to Dismiss Ex. E at 1–3 (letter to plaintiffs and their lawyer).  As the D.C. Circuit has observed, "all [parties] considering settlement do so based upon consideration of the adverse consequences that might result if the action proceeds and they do not prevail on the merits."  Am. Sec. Vanlines, Inc., 782 F.2d at 1061.  Accurately informing a party of the legal risks resulting from non-settlement does not "preclude[ ] that [party] from exercising free will and judgment."  Id.  As a result, an allegation that a party "agreed to the settlement because of fear of the adverse consequences . . . is insufficient as a matter of law . . . to establish a defense of duress."  Id. (internal quotation marks omitted).  Any other result in this context would permit any taxpayer to renege on his closing agreement simply by arguing that, in hindsight, the potential alternative penalties were too stiff.

What's more, the penalties that Harrison and Sprinkle variously describe as "catastrophic" and "draconian," Pls.'s Response at 12, 25, are a consequence of the statutory scheme enacted by Congress, not threats by the IRS.  See 31 U.S.C. § 5321(a).  And the couple risked incurring those penalties even before they enrolled in the OVDP.  See FAC at ¶¶ 60–62 (noting that plaintiffs did not report their foreign accounts prior to 2014).  Merely pointing to the possibility of statutorily authorized penalties is no more coercive than informing a counterparty of the potential outcomes of litigation.  See Am. Sec. Vanlines, Inc., 782 F.2d at 1061–62.  While the couple may be correct that the standard penalties for not reporting offshore accounts may at times be disproportionate to the crime, the IRS's practice of informing taxpayers that they risked some of these penalties if they chose to execute a closing agreement hardly amounts to duress.  This is particularly true given that the couple could have received lower penalties had

they submitted to an examination and established that their conduct was non-willful, as they strenuously assert.  See 31 U.S.C. § 5321(a)(5)(B) (capping non-willful violations at $10,000 per violation and setting penalties to zero where taxpayers can show that they correctly reported the amount in the accounts at the time and had "reasonable cause" for a given FBAR violation).

Nor does the IRS's rejection of Harrison and Sprinkle's certification of non-willfulness transform its conduct into duress.  As an initial matter, agency regulations permit it to reject a certification if it determines that "available information is [not] consistent with the taxpayer's self-certification of non-willful conduct."  IRS, Transition Rules: Frequently Asked Questions (FAQs), FAQ #7, https://www.irs.gov/individuals/international-taxpayers/transition-rules-frequently-asked-questions-faqs (last updated March 4, 2020).  That is quite different than finding that a taxpayer "willfully violated the law," as the plaintiffs suggest.  Pls.'s Resp. at 13.  The rejection of a self-certification thus does not mean that the IRS has predetermined the taxpayer's ability to demonstrate non-willfulness in a refund action.[7]  The IRS was entitled under its regulations to reject the certification and inform the couple of their options to either resolve the matter with a closing agreement or proceed to examination and retain the possibility of a subsequent refund suit.

---

[7] The IRS indicates that it informed the plaintiffs' prior attorney that the "available information [not] consistent with the taxpayer's self-certification" included the fact that the couple directed their Swiss bank to send account statements to an Italian attorney rather than to their U.S. address.  Def.'s Reply at 4.  The Court may not (and does not) consider this purported fact, which is not cabined within the pleadings, in deciding the IRS's motion to dismiss.  The Court raises the point instead to illustrate the difference between the "available information" standard and its characterization by the plaintiffs.  That is, the IRS can use such a fact to reject a self-certification without making a determination of non-willfulness that precludes taxpayers from establishing an innocent explanation for the fact as part of a refund claim.

In short, Harrison and Sprinkle had reasonable alternatives available to them and have not plausibly alleged that they were the victims of any threat by the IRS to execute the Closing Agreement. The Court will therefore dismiss Count IV of the amended complaint for failure to state a claim.

## IV.   Conclusion

For the foregoing reasons, the Court will grant the government's Motion to Dismiss. A separate Order will follow.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>March 11, 2021</u>